**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Nick RUSSO, James Lowery, Joseph Pine, V.L. Underhill, Jeff Underhill, Harry Almerico, Felipe Muratte, Renee Sanchez, Defendants-Appellants.**

No. 85–3000.

United States Court of Appeals, Eleventh Circuit.

Aug. 19, 1986.

Britt Whitaker, Tampa, Fla., for Russo.

Arthur E. Huttoe, John Lipinski, Miami, Fla., for Lowery.

Stevan T. Northcutt, Tampa, Fla., for Pine.

Kenneth L. Rodman, Jr., Tampa, Fla., for Almerico.

Ward A. Meythaler, U.S. Atty., Tampa, Fla., for U.S.

Frank J. Tassone, Jr., Jacksonville, Fla., Joel Gershowitz, Dept. of Justice, Crim. Div./Appellate Section, Washington, D.C., for Underhills and Pine.

Peter N. Macaluso, Tampa, Fla., (court-appointed), for Muratte.

Thomas John Hanlon, Lopez & Hanlon, Tampa, Fla., (court-appointed) for Sanchez.

Before FAY and KRAVITCH, Circuit Judges, and HENLEY *, Senior Circuit Judge.

### CORRECTED OPINION

HENLEY, Senior Circuit Judge:

Appellants Nick Russo, Joseph Pine, V.L. Underhill, Jeff Underhill, Rene Sanchez, James Lowery, Harry Almerico and Felipe Muratte challenge their RICO, RICO conspiracy, and other convictions on several grounds. We affirm.

Appellants were named in an indictment of numerous defendants handed down on February 3, 1984, and in a superseding indictment filed March 12, 1984. Count one charged appellants and others with participating in an illegal enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Count two charged appellants and others with

---

* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

conspiring to violate the RICO statute, in violation of § 1962(d). The balance of the indictment charged several substantive drug and drug related crimes.

The enterprise alleged by the government was a large drug importation and distribution organization headed by Angelo Bedami and John Hernandez. From 1978 through 1982 a number of people acting for the organization imported large quantities of drugs from Columbia and Ecuador into Florida, Georgia and Alabama. Distribution operations extended far and wide. The evidence showed a somewhat striking continuity in participants in the organization. The same landing strips, pilots, off-loaders, stash houses, and distributors were used repeatedly.

Following what may be described as a mass jury trial in the United States District Court for the Middle District of Florida,[1] appellants were convicted as follows: Lowery, Almerico and Muratte were convicted of violating §§ 1962(c) and (d); Pine was convicted of violating §§ 1962(c) and (d), of violating 21 U.S.C. § 952(a), of violating 21 U.S.C. § 841(a)(1), and of violating 18 U.S.C. § 1952; V.L. Underhill was convicted of violating 18 U.S.C. §§ 1962(c) and (d), and of three counts of violating 21 U.S.C. § 952(a); Sanchez was convicted of violating 18 U.S.C. § 1962(d), of two counts of violating 21 U.S.C. § 952(a), and of violating 21 U.S.C. § 841(a)(1); Jeff Underhill was convicted of violating 18 U.S.C. § 1962(d); and Russo was convicted of violating 21 U.S.C. § 843(b). These appeals followed. We affirm.

## I. MISJOINDER/SEVERANCE.

■ Appellants first challenge their convictions on the basis of misjoinder or erroneous denial of motion for severance. The standard for evaluating joinder under Fed.R.Crim.P. 8(b) was best summarized in *United States v. Hewes,* 729 F.2d 1302, 1318 (11th Cir.1984), *cert. denied,* —— U.S.

——, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), as follows:

> In order to determine whether the requirements for joinder contained in Rule 8(b) are met, we must examine the face of the indictment; if its allegations, taken as true, establish participation of each defendant in a single conspiracy, joinder is proper under the rule. *United States v. Russell,* 703 F.2d 1243, 1247 (11th Cir. 1983). If the indictment charges participation in a single conspiracy, joinder is proper although the indictment also charges "some but not all of the defendants with substantive counts arising out of the conspiracy." *United States v. Phillips,* 664 F.2d 971, 1016 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

(Footnotes omitted.) As in *Hewes,* we feel that the allegations in the indictment that all of the appellants participated in one RICO enterprise conspiracy sufficiently linked them for purposes of joinder under Rule 8(b). As will be demonstrated, we also find that the government proved one RICO enterprise conspiracy rather than multiple conspiracies.

Slightly different considerations must be addressed in reviewing a trial court's denial of a motion for severance pursuant to Fed. R.Crim.P. 14. These considerations were again summarized in *Hewes.*

> Rule 14 requires trial courts to balance the right of defendants to a fair trial, absent from the prejudice that may result from joint trials, against the public's interest in efficient and economic administration of justice. *Phillips,* 664 F.2d at 1016. We will reverse a trial court's denial of severance under Rule 14 only for an abuse of discretion. *United States v. Russell,* 703 F.2d at 1247; *United States v. Harper,* 680 F.2d 731, 733 (11th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982); *Phillips,* 664 F.2d at 1016. This court

---

1. The Honorable William Terrell Hodges, Chief Judge, United States District Court, Middle District of Florida, presiding.

has repeatedly stated that "[i]n order to demonstrate an abuse of discretion, the defendant must establish that the joint trial subjected him not just to some prejudice, but to compelling prejudice against which the district court could not afford protection." *Harper*, 680 F.2d at 733. The test for compelling prejudice is "whether [considering] all the circumstances of the particular case, as a practical matter, it is within the capacity of the jury to follow the admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct." *[United States v.] Kabbaby*, 672 F.2d [857] at 861 [ (11th Cir.1982) ], *quoting United States v. Zicree*, 605 F.2d 1381, 1389 (5th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Standing alone, the mere fact that the defendant would have had a better chance of being acquitted if tried individually is not "compelling prejudice." *Kabbaby*, 672 F.2d at 861–62.

*Hewes*, 729 F.2d at 1318–19.

Appellants allege that they were entitled to severances due to jury confusion evidenced by inconsistent verdicts, the danger of transference of guilt, and the danger of evidentiary spillover. They contend that the evidence against them individually was weak and that they would not have been convicted if they had been tried separately. None of the appellants raising this issue has proved compelling prejudice resulting from being tried en masse.

"There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together.... When many conspire, they invite mass trial by their conduct." *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). A large RICO enterprise conspiracy such as this one presents a situation where many defendants must be tried together. As will be discussed later, we feel that the convictions of these appellants were supported by sufficient evidence, and we do not find the jury's verdicts to be inconsistent. The jury in fact evidenced its ability to separate the evidence by convicting on some counts and acquitting on others. We will not look behind the verdicts for evidence of jury confusion. In addition, the court's special jury instructions dealing with transference of guilt and the separation of individuals and evidence were clear and correct, and there is no evidence that the jury was unable to follow them. In short, every safeguard was used "to individualize each defendant in his relation to the mass." *Id.*

## II. ALLEGED PRETRIAL ERRORS.

### A. Delay/Speedy Trial.

■ Appellant Pine contends that his statutory and constitutional rights to a speedy trial were violated. He first argues that he was not indicted within thirty days of his arrest, as required by the Speedy Trial Act, 18 U.S.C. § 3161(b).[2] Pine was the subject of a joint state and federal investigation. He contends that even though he was arrested by state officials and was charged with a state offense, his federal speedy trial clock began to run in mid-July of 1983 when the federal government "took control" of the case. The government contends that Pine's speedy trial clock began to run with his federal arrest on October 24, 1983. Pine was indicted on federal charges on November 16, 1983.

Pine's argument is a slightly modified version of the argument made in *United States v. Iaquinta*, 674 F.2d 260, 264 (4th Cir.1982), a case cited with favor by this court in *United States v. Shahryar*, 719 F.2d 1522, 1524 (11th Cir.1983). In *Iaquinta*, the defendant argued, and the district court agreed, that substantial federal in-

---

**2.** Section 3161(b) states in pertinent part:
 Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

volvement in the defendant's state investigation and state arrest was sufficient to start the speedy trial clock. *Iaquinta*, 674 F.2d at 263. The Fourth Circuit disagreed and reversed the district court's dismissal of the indictments. *Id.* at 269. The court began its analysis by noting that "[s]ince the Act applies only to federal prosecutions it is only a *federal* arrest, not a state arrest, which will trigger the commencement of the time limits set in the Act." *Id.* at 264 (emphasis in original). The court then determined, after discussing several similar cases reaching the same conclusion, that even "substantial" or "extensive" federal involvement in the state investigation and arrest is not enough to start the speedy trial clock. *Id.* at 267–68.

Pine contends that the government had in effect taken over the state investigation in mid-July of 1983 and that the state had lost all interest in his case. He therefore contends that he was being held by state authorities to answer federal charges. We cannot agree. Although the government may have been extensively involved in the ongoing investigation of Pine's case, Pine was being held to answer state charges up to the time that those charges were dismissed. He was at no time in custody to answer federal charges or under federal arrest until October 24, 1983, when the state charges were dismissed and he was immediately arrested on federal charges. Since he was indicted less than thirty days later, there was no violation of the Speedy Trial Act.

■ Pine next argues that his fifth amendment right to due process of law was violated by the government's delay in indicting him. Pine contends that his state prosecution was kept alive long after the state had lost interest merely for the purpose of allowing the government to take advantage of more liberal state discovery rules. He therefore concludes that his federal arrest and indictment were intentionally delayed by the government in order to gain a tactical advantage over him.

In order to prevail on this claim, Pine must show that his right to a fair trial was substantially prejudiced and that the government intentionally delayed his arrest and indictment in order to gain a tactical advantage over him. *United States v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir.), *modified*, 778 F.2d 673 (1985), *cert. denied*, — U.S. —, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986); *see also United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2300, 81 L.Ed.2d 146 (1984); *United States v. Lovasco*, 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977). "As we have observed, 'this standard is an exceedingly high one....'" *Weinstein*, 762 F.2d at 1542 (quoting *Tiemens v. United States*, 724 F.2d 928, 929 (11th Cir.1984)).

For the most part, Pine presents only general allegations of prejudice in the form of lost witnesses and evidence. Such general allegations are not sufficient to constitute proof of substantial prejudice. *See United States v. Warren*, 772 F.2d 827, 836 (11th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986). For specific examples of prejudice Pine points to the fact that many government witnesses remembered that a Joseph (or Jose) Pine had taken part in various drug ventures but were unable to identify him in the courtroom. He contends that as a result of the inability of these witnesses to identify him, he was unable to effectively cross-examine regarding these drug ventures. We cannot see how Pine could have been prejudiced by the inability of government witnesses to identify him. Pine also has presented no evidence supporting his theory that the government intentionally extended his state prosecution long after the state had lost interest merely to take advantage of more liberal state discovery rules.

■ Finally, Pine contends that the delay between his arrest and the commencement of his trial on August 15, 1984 violated his sixth amendment speedy trial right. Sixth amendment speedy trial right claims are evaluated under the balancing test set out in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972), as follows:

A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

(Footnote omitted.) The length of delay was ten months from the time of Pine's arrest. In light of the fact that numerous defendants were involved in this case, and that numerous pretrial motions and requests for extension of time were filed by the defendants, we do not view this delay as unreasonable. When we note in addition that Pine has not proved any real prejudice resulting from the delay, we conclude that Pine's sixth amendment speedy trial right was not violated.

In summary, we find no merit in Pine's various speedy trial claims resulting from alleged preindictment and pretrial delay.

### B. Suggestive Photographic Identification.

 Appellant Pine, who is said to have been a pilot on drug import flights, contends that the trial court erred by allowing a police officer to give trial testimony about an eyewitness' identification of Pine from an impermissibly suggestive photographic array. Pine claims that his photograph had a yellow tint and stood out from the others. The eyewitness testified that he noticed the yellow tint of the photograph, but that he picked it because it looked like the pilot he had seen.

Challenged photographic identifications are reviewed using a two-part test. The court must first decide whether the display was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification. *See United States v. Cueto*, 611 F.2d 1056, 1063–64 (5th Cir.1980).[3] The trial court found nothing suggestive about the array or the procedure, and it denied Pine's pretrial suppression motion. Our review of the array brings us to the same conclusion. Two of the nine photographs have a definite yellow tint. Two or three other photographs have a reddish-pink tint. The subjects in the photographs are all relatively similar in appearance, and no single photograph stands out from the others. We find nothing suggestive about the array and we need not reach the second part of the photographic identification review test. We therefore hold that the trial court did not err in refusing to suppress the photographic identification of Pine. We also find that the testimony of the officer corroborating the identification was not hearsay and was properly admitted into evidence by the trial court. *See id.* at 1063.

### III. ALLEGED TRIAL ERRORS.

### A. Witness Hernandez's Mention of Willingness to Take a Lie Detector Test.

 On three different occasions during his testimony, witness John Hernandez stated his willingness to take a lie detector test in order to demonstrate the truth of a particular answer he had given. There was no objection to his first polygraph reference. The court sustained an objection to Hernandez's second polygraph reference and instructed the jury to disregard it. The court refused, however, to grant a motion for mistrial because it felt that none of the defendants had been prejudiced by the statement. An offer by the court to instruct the jury on the inadmissibility of polygraph evidence was declined by the defendants. A motion for mistrial made subsequent to Hernandez's third polygraph reference was denied by the court on the same basis as was the previous motion.

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Appellant Sanchez now contends that the court's denials of the motions for mistrial were erroneous.

It is now settled that polygraph evidence is inadmissible in this circuit, *United States v. Holman*, 680 F.2d 1340, 1352 (11th Cir. 1982), and we agree with Sanchez that Hernandez's polygraph references were improper. We note, however, that Hernandez was only attempting to bolster the credibility of three specific answers given by him. The factual content of these answers was insignificant and the prejudicial effect of having the credibility of the answers bolstered by polygraph references was minimal. In addition, the court upon objection instructed the jury to disregard the polygraph reference and offered to instruct the jury on the inadmissibility of polygraph evidence.

In the two previous cases of *Holman*, 680 F.2d at 1351–52, and *United States v. Martino*, 648 F.2d 367, 390 (5th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 *and* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982), we found that any prejudice resulting from similar references to polygraph tests was cured by the trial court's cautionary instructions. We are presuaded to reach the same conclusion here. "The decision whether or not to grant a mistrial is within the sound discretion of the trial court." *United States v. Melton*, 739 F.2d 576, 579 (11th Cir.1984). We find no abuse of discretion in the trial court's denials of these motions for mistrial.

*B. Admission of Hearsay Testimony.*

Appellant Almerico contends that the trial court erred in admitting into evidence testimony by witness Lester Rushing that he claims was hearsay because it was based on entries in the books of the drug organization. The challenged testimony was as follows:

Q. During the time period while you were keeping the books what drugs was Mr. Almerico on the books for distributing?

A. Marijuana.

Q. Is that the only one?

A. Yes, sir.

Q. And what was the quantity or book value of the marijuana that you distributed to him during that time period?

[Objection on the basis of hearsay is overruled.]

. . .

Q. What would be about the book value of the marijuana that you would have distributed to Mr. Almerico?

A. I would say probably about a half million, three-quarters of a million dollars worth.

"An out-of-court statement is considered hearsay only if the witness (other than the declarant) is testifying to the statement in order to prove or demonstrate the truth of that statement." *United States v. Fox*, 613 F.2d 99, 101 (5th Cir.1980) (citing Fed. R.Evid. 801(c)). We do not feel that the testimony of Rushing met the definition of hearsay. Rushing both distributed drugs for the organization and kept records of the distributions. Thus, if the destroyed organization records were considered out-of-court statements, the declarant, Rushing, testified at trial and was subjected to cross-examination. In addition, the facts about Almerico contained in the challenged testimony were within Rushing's personal knowledge. "The testimony of a co-conspirator as to facts within his knowledge involves no hearsay problem, since the statements are given on the stand and are open to cross-examination." *United States v. Perez*, 489 F.2d 51, 61 n. 15 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). *See also United States v. Steel*, 759 F.2d 706, 712 (9th Cir.1985); *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir.1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978).

We therefore hold that the challenged testimony of Rushing was properly received in evidence over a hearsay objection.

## C. Erroneous Limitation of Cross-Examination.

 Edward Binion, a government informant, was one of the witnesses who was able to identify appellant Pine in the courtroom. During Binion's testimony it was revealed that he had filed a lawsuit against the government resulting from a claim that he had filed seeking compensation for acting as an informant in a previous case. He was cross-examined at length by Pine regarding this claim, and Pine requested that the government furnish all documents that it had on the subject. Pine later received the documents and requested that they be admitted into evidence and that he be allowed to further cross-examine Binion regarding the claim. The court denied both requests, finding that the claim was a collateral matter and that the documents did not add anything new to the already thorough cross-examination. Pine contends that the court erred in restricting his cross-examination of Binion.

Pine argues that the documents contained evidence showing that a substantial part of Binion's claim was for a reward rather than for compensation. He claims that Binion denied that part of his claim was for a reward, and that the documents could have been used during further cross-examination to impeach Binion and show his bias. We note first that it is far from clear that Binion's compensation claim from a previous case showed any bias by him in this case. We are inclined to agree with the trial court that Binion's claim was an irrelevant and collateral matter. "There is no right to impeach a witness with respect to collateral or irrelevant matters." *United States v. Hawkins,* 661 F.2d 436, 444 (5th Cir. Unit B 1981) (footnote omitted), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287, 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1355, *and* 459 U.S. 832, 103 S.Ct. 72, 74 L.Ed.2d 71 (1982).[4] In addition, if a defendant has been allowed sufficient cross-examination to satisfy his sixth amendment right to confrontation, the scope of further cross-examination is in the sound discretion of the trial court. *See Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *Hawkins,* 661 F.2d at 444; *United States v. Alonzo,* 571 F.2d 1384, 1388 (5th Cir.), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). While Binion did initially deny that part of his claim was for a reward, he did eventually admit to it during cross-examination by Pine. We feel that cross-examination was more than sufficient to satisfy Pine's right of confrontation, and since Binion admitted that part of his claim was for a reward, further cross-examination on that subject would have been cumulative and useless. Binion's potential bias was more than adequately exposed. We therefore find no abuse of discretion in the trial court's limitation of Pine's cross-examination of Binion.

## D. Failure to Give Requested Instruction.

 The Underhills allege that the trial court erred in not giving their requested jury instruction that guilt cannot be inferred from a defendant's election not to testify or produce evidence. The Underhills correctly point out that "a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." *Carter v. Kentucky,* 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981). We are convinced, however, that the court's decision not to give the particular instruction requested by the Underhills was not error.

The instruction given by the court was as follows:

> The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider

---

4. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), we adopted as binding precedent all of the post-September 30, 1981 decisions of the former Fifth Circuit Unit B.

that in any way during your deliberations. The government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.

The Underhills contend that the instruction given by the court was materially different from the instruction requested by them and did not remove all danger that the jury would infer guilt from their decisions not to, testify. We find that the court's instruction regarding a defendant's choice not to testify was adequate and did not differ appreciably from the Underhills' proposed instruction. In fact, the court's instruction that a defendant's decision not to testify could not be considered "in any way during ... deliberations" was broader and more beneficial to the Underhills than their requested instruction. We therefore find no error in the court's failure to give the Underhills' requested "no-adverse-inference" instruction.

## IV. SUFFICIENCY OF THE EVIDENCE.

Several appellants challenge the sufficiency of the evidence to support their convictions. We must determine on review whether a reasonable jury could have found that the evidence established the appellants' guilt beyond a reasonable doubt, and in making this determination we must view the evidence in the light most favorable to the verdict and give the government the benefit of all reasonable inferences and credibility choices. *See United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). In reviewing conspiracy convictions, the question is whether there is substantial evidence to support the verdicts. *Martino,* 648 F.2d at 393.

The five elements of proof for a substantive RICO conviction, 18 U.S.C. § 1962(c), are:

(1) the existence of the enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that he participated in the conduct of the affairs of the enterprise; and (5) that he participated through a pattern of racketeering activity.

*Martino,* 648 F.2d at 394. "A pattern of racketeering activity" requires the commission of at least two of the predicate acts of racketeering listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1961(5). In order to convict on a charge of conspiracy to violate RICO, 18 U.S.C. § 1962(d), the government must show:

that the person objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.

*Martino,* 648 F.2d at 394.

### A. Lowery.

■ Appellant James Wayne Lowery was convicted of violating §§ 1962(c) and (d). Lowery argues that his convictions should be reversed because no witness positively identified him as being the person involved in the Bedami drug organization. Lowery contends that witness Raul Fernandez, who was able to connect him with the organization, identified someone else at trial when asked to find Lowery in the courtroom.

Lowery's argument is unpersuasive. The record does clearly reflect that when Fernandez was asked to identify Lowery's father he instead identified Lowery's father's attorney, but the record does not show that Fernandez pointed out the wrong person when asked to identify Lowery. In addressing this very point on Lowery's motion for judgment of acquittal, the trial court stated:

While I was not called upon to have the record at that time manifest the identification of Mr. James Lowery by Mr. Raul Fernandez, my note reflects and my recollection is that by gesture and by pointing in connection with the reference made in the transcript that he pointed out Mr. James Lowery or the younger Mr. Lowery.

It's a question for the jury, of course, as to whether my observation was correct in that respect.

Since we have no definite notation of the identification or misidentification of Lowery in the transcript and it is impossible to judge from Fernandez's testimony whether he correctly pointed out Lowery, we will give deference to the observations of the trial court and the ability of the jury to determine whether the identification was correct.

In addition, it is clear from the testimony of other witnesses that the Wayne Lowery that they knew as being a participant in the organization was the James Wayne Lowery who was a defendant in this case. When we view the evidence in the proper light we conclude that it was more than sufficient to support the §§ 1962(c) and (d) convictions of Lowery.

### B. Almerico.

 Appellant Harry Almerico was convicted of violating § 1962(c) and (d). The two predicate acts with which he was charged were possession of marijuana with intent to distribute both in April to May of 1979 and on June 22, 1981. Witness John Hernandez, one of the major figures in the Bedami organization, testified that in April or early May of 1979 Almerico distributed four thousand pounds of marijuana for the organization, and that he collected close to one million dollars from Almerico after the distribution. Hernandez also testified that Almerico was an investor in a shipment of marijuana brought into Atlanta around June 22, 1981, and that he was responsible for distributing three hundred to three hundred fifty pounds of that shipment in the St. Louis area.[5] In addition, as discussed earlier, witness Rushing testified that Almerico was responsible for distributing about one half million to three quarters of a million dollars worth of marijuana for the organization during the time that Rushing was in charge of distribution and bookkeeping.

When viewed in the proper light, the evidence regarding the predicate acts attributed to Almerico was substantial. Indeed, we find the evidence both of his participation and his agreement to participate in the organization sufficient to support his §§ 1962(c) and (d) convictions.

### C. Muratte.

 Appellant Felipe Muratte was convicted of violating §§ 1962(c) and (d). Muratte argues that the government did not prove the specific predicate acts charged in the indictment, but instead proved separate and different acts.

In the substantive RICO count of the indictment the government charged that on or about January 27, 1982, in Chicago, Joe Krollman, Carl Begovich, V.L. Underhill, Felipe Muratte, Jeff Underhill and others possessed marijuana with intent to distribute, and that on or about that same day those same people transported, or caused to be transported, marijuana in interstate commerce from Chicago to Tampa and from Chicago to Pittsburgh. In the RICO conspiracy count, the government incorporated those predicate acts by reference and in addition alleged that a meeting between Hernandez, Rushing, V.L. Underhill, Sanchez, Muratte, Joe Krollman and others was held in Chicago in mid-January.

Hernandez and Rushing both testified that in January of 1982 they had problems with a distributor in Chicago who did not want to pay or give marijuana back. Rushing made several trips to Chicago in an attempt to regain possession of the marijuana, but he was unsuccessful. On one of these unsuccessful trips, he took some of Begovich's drivers with him to bring the marijuana back. On the final trip, Rushing, Muratte and others managed to get the marijuana back. It was loaded on a U–Haul truck, and Muratte and a man named Ben attempted to drive it to a stash house in Georgia. The truck broke down

---

**5.** Almerico complains that Hernandez's testimony constituted coconspirator hearsay testimony, was not legally admissible, and therefore should not be considered in the sufficiency of the evidence evaluation. We note that Almerico has not referred us to any particular portions of the testimony of Hernandez in connection with his allegation. Our review of the pertinent portions of Hernandez's testimony does not reveal any coconspirator hearsay whatever.

on the road in Georgia, and the marijuana was transferred to several cars and transported to a stash house in Tampa.

Muratte contends that since the government did not prove that Begovich was present at the time that possession of the marijuana was regained, the government proved an entirely different incident than the one alleged. He argues that this constituted a material variance between the indictment and the evidence. In *United States v. Lippner*, 676 F.2d 456, 465 (11th Cir.1982), this court addressed a very similar argument and found that it bordered on the frivolous. We are inclined to say the same here. "[A] variance between allegations and proof is fatal only when it affects the substantial rights of the defendant by failing to sufficiently notify him of the charges against him so that he can prepare his defense and will not be surprised at trial." *United States v. Phillips*, 664 F.2d 971, 1036 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 *and* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). In light of the testimony of Hernandez and Rushing, it is clear that the incident proved by the government was the same one alleged in the indictment. Muratte was sufficiently informed in the indictment of the incident that was proved by the government at trial, and the alleged variance did not affect his substantial rights.

Muratte also alleges a variance in the government's proof of the second predicate act. He contends that the evidence only showed that he transported marijuana from Chicago to Georgia, rather than from Chicago to Tampa and from Chicago to Pittsburgh as alleged in the indictment. We view this as a failure of proof rather than a variance. The government did not prove a different incident from the one that it alleged, but rather it failed to prove all that it alleged. Muratte could have been considered a principal in transporting the marijuana from Chicago to Tampa because he transported it from Chicago to Georgia and probably aided in transporting it from Georgia to Tampa, *see* 18 U.S.C. § 2(a), but

the government's failure to prove that Muratte personally transported marijuana between Chicago and Pittsburgh, and Georgia and Tampa is immaterial. "The government need not prove every fact charged in the indictment as long as it proves enough of the facts charged therein to satisfy the essential elements of the crime." *United States v. Potts*, 540 F.2d 1278, 1279 (5th Cir.1976); *see also United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir. Unit B 1980). Proof of transportation of marijuana from Chicago to Georgia was more than sufficient to satisfy the elements of 18 U.S.C. § 1952 and constitute a predicate act under 18 U.S.C. § 1961(1)(B).

The evidence presented by the government was substantial, and a reasonable jury could have found beyond a reasonable doubt that Muratte both committed and agreed to commit two of the predicate acts with which he was charged. The evidence was therefore sufficient to support his §§ 1962(c) and (d) convictions.

### D. Pine.

The government alleged that appellant Joseph Pine was a pilot for the organization on several ventures. Pine was charged with several predicate acts in the §§ 1962(c) and (d) counts. In the § 1962(c) count he was charged with importing marijuana and methaqualone into the United States at Tampa and Okeechobee, Florida on or about July 30, 1981, with importing marijuana into the United States at Dublin, Georgia on or about November 4, 1981, with possession of marijuana with intent to distribute at the Hillsboro Airport in Florida on or about December 1, 1981, with traveling in interstate and foreign commerce between the Middle District of Florida and Columbia, South America, with intent to perform illegal acts in furtherance of an illegal enterprise, and later performing or attempting to perform illegal acts to promote an illegal enterprise on or about June 20 to July 4, 1982, and with importing cocaine into the United States in the Middle District of Florida on or about July 4, 1982.

The § 1962(d) count adopted all of the charges in the § 1962(c) count, and in addition charged that Pine landed an airplane at Hillsboro Airport in Florida on December 1, 1981. Pine was convicted under both §§ 1962(c) and (d).

In addition, Pine was convicted on substantive counts of importing marijuana and methaqualone into the United States at Tampa on July 30, 1981, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2, of possessing with intent to distribute marijuana and methaqualone at Tampa on July 31, 1981, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and of traveling in interstate and foreign commerce with intent to commit an illegal act in furtherance of an illegal enterprise, and thereafter committing or attempting to commit an illegal act in furtherance of an illegal enterprise, on or about June 20 to July 4, 1982, in violation of 18 U.S.C. § 1952.[6]

■ The Okeechobee venture on July 30, 1981 was the basis of one alleged predicate act and also of the substantive counts of importing and possessing with intent to distribute marijuana and methaqualone. Two government witnesses testified that Jose Albanez, an alias used by Pine, was the pilot of the venture, but they were unable to identify Pine in the courtroom. Pine claims that since Jose is a common name used by drug pilots, the failure of government witnesses to identify him in court rendered the government's evidence insufficient to connect him with the Okeechobee venture. Witness Hernandez, however, testified that Pine was also known as Jose Pi or Jose Albanez, and he correctly identified Pine in court. He also testified that Jose Albanez flew one venture into Florida in the summer of 1981. This testimony combined with the testimony of other government witnesses connecting Jose Albanez with the July 30, 1981 Okeechobee venture was sufficient to show that Pine flew that venture.

■ Pine contends that the government failed to show proper venue for either the importing or possession charge. In connection with this argument he points out that Okeechobee is outside the Middle District of Florida. The evidence showed that the marijuana was taken from Okeechobee to Hernandez's house in Tampa for weighing and distribution. There apparently was no evidence indicating that Pine accompanied the drugs to Tampa. Tampa is within the Middle District of Florida.

With respect to venue for the importing charge, it has been observed that "importation of a controlled substance in violation of 21 U.S.C. § 952(a) is a 'continuous crime' that is not complete until the controlled substance reaches its final destination point, and [...] venue is proper in any district along the way." *United States v. Gray*, 626 F.2d 494, 498 (5th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 *and* 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981). Since Tampa rather than Okeechobee was the final destination of the drugs imported by Pine, venue for the importing charge was perfectly proper in the Middle District of Florida.

■ A somewhat different situation is presented with respect to the possession charge. Nothing in the evidence clearly indicates that Pine had actual or constructive possession of the drugs in Tampa. He was, however, charged with aiding and abetting the possession of the drugs in Tampa by reference to 18 U.S.C. § 2. "Aiding and abetting need not be specifically alleged in the indictment; assuming the evidence supports it, the accused can be convicted of aiding and abetting so long as the jury is instructed on it." *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir.1984). Pine could have been convicted of aiding and abetting if the evidence was sufficient to show that he performed an act which contributed to the execution of the

---

**6.** Pine was charged in several other counts, but these charges were either dismissed by the court or were the subject of mistrial due to the jury's inability to reach a verdict. We are not concerned with those charges here.

crime and that he intended to aid in the commission of the crime. *See United States v. Brantley*, 733 F.2d 1429, 1434 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985).

Those who possessed drugs at Hernandez's house in Tampa were supplied with those drugs by Pine. He shared criminal intent with them by possessing the drugs in Okeechobee, and he willingly participated in a criminal venture that had as its object possession and distribution of drugs in and from Tampa. The evidence was more than sufficient for the jury to find Pine guilty of aiding and abetting, *see id.* at 1435, and the court did give the jury an aiding and abetting instruction. Since an aider and abettor may be tried in the district in which a principal committed the offense, *id.* at 1434, we find that venue for the possession charge was proper in the Middle District of Florida.

The Dublin, Georgia venture on November 4, 1981 was alleged as a predicate act. One government witness testified that Jose was the pilot of the Dublin venture, but he was unable to identify Pine in the courtroom. Raul Fernandez, who identified Pine in the courtroom, testified that he understood that the pilot of the Dublin venture was Albanez, but that it was too dark for him to see the pilot when the plane came in. Ed Binion, a government informant, identified Pine in the courtroom and testified that he had flown with Jose Pi on the Dublin venture. The evidence was more than sufficient to show that Pine piloted the Dublin, Georgia venture on November 4, 1981.

The Hillsboro Airport venture of December 1, 1981 was alleged by the government as a predicate act. Hernandez, Angelo Bedami, the head of the organization, James Lumberson, the owner of the airport, and Richard Gaffney, a mechanic at the airport, all connected Pine with this venture. Hernandez testified that Albanez personally told him that he was going to pilot the Hillsboro venture.

Gaffney testified that he spent about fifteen minutes with the pilot Jose during the Hillsboro venture, but, after stating that it had been two and one-half years since he had seen Jose, he was unable to find Pine in the courtroom. Gaffney did, however, correctly identify Pine in an earlier photographic array, and Pine's challenges to this identification have already been discussed. While we find that the evidence was sufficient for a reasonable jury to find that Pine aided and agreed to aid the enterprise through the commission of this predicate act, we note that the jury was unable to reach a verdict on the separate substantive charges against Pine resulting from the Hillsboro venture.

The June 20 to July 4, 1982 venture was alleged as a predicate act and was also alleged separately as a violation of the Travel Act, 18 U.S.C. § 1952. Bob Sweet, another pilot, testified that he and Jose flew to Columbia to pick up a load of cocaine. When they attempted to take off for the return trip, Jose crashed the plane. As a result, Sweet testified that he stayed in Columbia while Jose returned to the United States to get another plane. Jose returned to Columbia with a new plane, and Sweet and Jose dropped the cocaine over a farm near Fort Meyers, Florida. Sweet was unable to find Jose in the courtroom, but the testimony of Bedami left little doubt that Jose was Pine. Bedami, who identified Pine in court as Jose Albanez, testified that when Jose returned from Columbia to get a new plane he personally told Bedami about the crash. Bedami also testified that after they were unable to find the cocaine that was dropped, Jose personally told him about the drop and speculated that Sweet might have thrown it out of the plane too soon.

 Pine argues that the charge of importing cocaine was dismissed by the court and that the government therefore did not prove that he committed a crime in connection with this travel, as required in § 1952. We disagree. Substantial evidence showed that Pine attempted to import cocaine into the United States in violation of 21 U.S.C. § 963. Traveling in interstate or foreign commerce with the intent to import cocaine

into the United States, and thereafter attempting to import cocaine into the United States, constitutes a violation of the Travel Act. We therefore find that the evidence was sufficient for a reasonable jury to find Pine guilty of such a violation beyond a reasonable doubt.

From what has been said, it follows that from the evidence the jury could find beyond a reasonable doubt that Pine violated 18 U.S.C. § 1962(c) and (d) by committing and agreeing to commit at least two of the predicate acts alleged by the government. We also find that the evidence was sufficient for the jury to find Pine guilty of violating 21 U.S.C. § 952(a), and 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 on July 30, 1981, and of violating 18 U.S.C. § 1952 between June 20 and July 4, 1982.

■ Pine makes other contentions, but only one warrants brief discussion. Pine contends that the evidence was insufficient to convict him of violating 18 U.S.C. §§ 1962(c) and (d) because he did not participate in the enterprise. He contends that he was a freelance pilot, was recruited by the enterprise as needed, and was paid regardless of whether the venture was successful. The evidence clearly establishes that Pine not only piloted numerous ventures, but participated in planning them as well. Elements (3), (4) and (5) of a RICO violation, as set out in *Martino*, 648 F.2d at 394, were more than satisfied in this case. Pine was employed by the enterprise, participated in the conduct of the affairs of the enterprise, and committed at least two predicate acts in furtherance of the enterprise. Pine's contention is without merit.

### E. Sanchez.

Appellant Rene Sanchez was convicted of conspiring to violate RICO, in violation of 18 U.S.C. § 1962(d), of importing marijuana into the United States at Tampa and elsewhere during the first two weeks of July, 1981, in violation of 21 U.S.C. § 952 and 18 U.S.C. § 2, of importing marijuana and methaqualone into the United States at Tampa and elsewhere on July 30, 1981, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2, and

of possession with intent to distribute marijuana and methaqualone at Tampa on July 31, 1981, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

In the substantive 18 U.S.C. § 1962(c) RICO count on which he was acquitted, Sanchez was charged with two predicate acts. First, he was charged with importing marijuana and methaqualone on July 30, 1981, the same charge as one of the substantive counts on which he was convicted. He was also charged with the second predicate act of importing marijuana and methaqualone at Dublin, Georgia on September 13, 1981. The § 1962(d) RICO conspiracy count incorporated those predicate acts, and in addition charged him with participating in a meeting with members of the Bedami organization at Chicago in mid-January of 1982.

Hernandez testified that Sanchez, in partnership with Joaquin Granados, was the main supplier of drugs to the Bedami organization. Hernandez correctly identified Sanchez in court. Hernandez testified that Granados was usually in Columbia, and that Sanchez represented him in the United States. Sanchez participated in the meetings in which the July, 1981 Okeechobee ventures were arranged. Sanchez and Granados supplied the drugs for the first July, 1981 Okeechobee venture, and Sanchez was notified by Hernandez when the drugs arrived safely in Tampa and were weighed. Sanchez and Granados also provided the drugs for the July 30, 1981 Okeechobee venture, and they were both present at Hernandez's house when the drugs arrived and were weighed.

Sanchez also participated in planning the September 13, 1981 Dublin, Georgia venture involving the importation of marijuana and methaqualone. Sanchez and Granados provided the drugs for the venture, and Sanchez flew with Hernandez to Georgia to participate. Sanchez and Hernandez unloaded the drugs at a stash house in Georgia. They then stayed in the stash house, loading cars with drugs until all of the drugs had been safely transported to Tampa. Hernandez and Sanchez then went to

Tampa to inspect the drugs and make sure that they were safe.

█ Sanchez first challenges the sufficiency of the evidence to support his RICO conspiracy conviction. He contends that the jury's acquittal of him on the substantive RICO count means that they found him not guilty of both alleged predicate acts. He therefore argues that only the predicate act alleged in the RICO conspiracy count remained, and that one predicate act is insufficient to support his conviction. This argument is unconvincing. First, we cannot assume that the jury did not believe both of the predicate acts alleged in the substantive RICO count. This is especially true in light of the fact that the jury convicted Sanchez on a substantive count identical to one of the predicate acts. Second, whether or not the jury believed that Sanchez actually committed the predicate acts has nothing to do with whether the jury believed that he agreed to commit the predicate acts. Agreement to commit two predicate acts, and not the actual commission of two predicate acts, is the key issue in a RICO conspiracy charge. *See Martino,* 648 F.2d at 383, 394. Sanchez certainly manifested his agreement to participate in the two importing ventures through his actions, and the evidence is more than sufficient to support his RICO conspiracy conviction.

█ Sanchez also challenges his convictions on the substantive counts. In the early July, 1981 Okeechobee venture, Sanchez knowingly participated in importing drugs into Tampa by participating in the planning of the venture, by participating with his partner Granados in supplying the drugs to be imported, and by making sure that the drugs arrived in Tampa safely. When we view this evidence in a light most favorable to the government, we find that the evidence was sufficient for the jury to find Sanchez guilty beyond a reasonable doubt of importing marijuana into the United States at Tampa in early July, 1981, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2. Sanchez also knowingly participated in importing drugs into Tampa dur-

ing the July 30, 1981 venture by participating in planning the venture, by participating in supplying the drugs to be imported, and being present when the drugs arrived in Tampa and were weighed. This evidence was likewise sufficient for the jury to find Sanchez guilty of importing marijuana and methaqualone into the United States at Tampa on July 30, 1981, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2.

█ With regard to the charge of possession with intent to distribute marijuana and methaqualone at Tampa on July 31, 1981, Sanchez contends that the evidence does not show that he was ever in actual or constructive possession of the drugs. While the evidence might have been clearer on this point, it does tend to show that Sanchez and Granados had a financial interest in and at least part ownership of the drugs until they were distributed, sold, and Sanchez and Granados were paid. This would constitute constructive possession by Sanchez. In any case, Sanchez did aid and abet the possession of the drugs at Tampa by participating in supplying them and participating in planning their importation into Tampa. His actions manifested his intent to aid in the commission of an offense, and he shared criminal intent with those who actually possessed the drugs at Tampa. When we view the evidence in a light most favorable to the government, we hold that the evidence was sufficient for the jury to find beyond a reasonable doubt that Sanchez was guilty of possessing with intent to distribute marijuana and methaqualone at Tampa on July 31, 1981, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

█ Sanchez argues that the jury's verdicts were inconsistent, and that this shows the confusion of the jury and the prejudice to Sanchez in being tried with the numerous other defendants. First, we find nothing inconsistent about the verdicts. As stated previously, Sanchez's acquittal on the substantive RICO charge does not lead to the conclusion that the jury found him not guilty of *both* of the alleged predicate acts. If the jury had found Sanchez to be

not guilty of the September 13, 1981 venture alone, they would have been required to acquit him on the substantive RICO count regardless of their thinking on the July 30, 1981 venture. Thus, it was not necessarily inconsistent for the jury to acquit Sanchez on the substantive RICO count and convict him on the July 30, 1981 importing count. It was also not inconsistent for the jury to acquit Sanchez on the substantive RICO count and convict him on the RICO conspiracy count based on the same predicate acts. As indicated, the jury could have found that Sanchez agreed to participate in the enterprise through the commission of two predicate acts without finding that he actually committed the two predicate acts. Second, it is established that inconsistent verdicts rendered in the same proceeding ordinarily cannot be upset. *See United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 475–77, 83 L.Ed.2d 461 (1984) (citing *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932)).

 Finally, Sanchez alleges that the government failed to prove that the defendants in this case participated in a single enterprise or conspiracy as alleged in the indictment. He contends that the government instead proved a number of enterprises or conspiracies, that this was a material variance from the allegations in the indictment, and that reversal of his convictions is therefore required. In this circuit an enterprise has been defined as any group of persons "whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The "enterprise conspiracy" is a broader concept than that of an ordinary conspiracy.

> Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs. To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was to define that objective through the substantive provisions of the Act.
>
> . . .
>
> The substantive proscriptions of the RICO statute apply to insiders *and outsiders* —those merely "associated with" an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity. Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.

*Id.* at 902–03 (citations and footnotes omitted) (emphasis in original).

Here, the government alleged and proved one single closely knit enterprise conspiracy to import and distribute drugs, headed by Bedami and Hernandez. While not every defendant participated in every venture, there was surprising continuity in the participants. Each person had a set job, whether it was providing the air strip, piloting the plane, offloading the drugs, guarding the stash house, or distributing the drugs. As was discussed earlier, Sanchez sufficiently manifested his agreement with the overall objective of the enterprise conspiracy. We find neither a prejudicial variance between the allegations in the indictment and the proof, nor any prejudicial misjoinder of Sanchez due to a variance.

### F. *Russo.*

Appellant Nick Russo was acquitted on the substantive RICO count, 18 U.S.C. § 1962(c), and on the RICO conspiracy count, § 1962(d), but he was convicted of using a telephone to facilitate the distribution of a controlled substance on August 8, 1980 at Tampa, in violation of 21 U.S.C. § 843(b). The predicate acts attributed to Russo in the 18 U.S.C. §§ 1962(c) and (d) counts were importing cocaine into the United States at Tampa and Polk County, Florida in July of 1980, and using a telephone to facilitate the importation and distribution of a controlled substance on August 8, 1980, at Tampa.

Russo first contends that the jury's verdicts acquitting him on the substantive RICO and RICO conspiracy charges and convicting him on the 21 U.S.C. § 843(b) charge were inconsistent. He contends, as did Sanchez, that the verdicts show jury confusion and prove that he was found guilty of the § 843(b) offense simply because he was tried with numerous other obviously guilty defendants. He therefore concludes that the prejudice of being tried en masse and not being granted severance resulted in his conviction on the § 843(b) charge.[7] As we have stated, verdicts acquitting on a substantive RICO charge and convicting on a substantive count identical to one of the predicate acts alleged are not inconsistent. No jury confusion is evidenced by these verdicts, and in fact it appears that the jury was able to carefully weigh the evidence separately and follow the court's instructions. *See United States v. Kabbaby*, 672 F.2d 857, 862 (11th Cir.1982). And as noted, inconsistent verdicts rendered in the same proceeding ordinarily cannot be upset. *Powell*, 469 U.S. at —, 105 S.Ct. at 475–77.

In connection with the § 843(b) charge, the government introduced into evidence transcripts of telephone conversations between Russo and codefendant Salvatore Lorenzo and between Russo and codefendant Leon Wood. In the conversations with Lorenzo, Russo stated that his wife had been stopped at the airport in Miami with two hundred seventy-five thousand dollars that she had taken down there for him. He asked Lorenzo what he should tell his wife to tell the Customs officials about the money. Lorenzo then contacted an attorney in Miami. He gave Russo the lawyer's name and address, and he told Russo to tell his wife to go and see the lawyer immediately. He also told Russo to tell his wife not to give any information to Customs other than her name and address. In the conversations with Wood, Russo discussed the money and the two talked about fabricating a story as to the money's source. Witness Gary McKean testified that at about this time, Wood came to his house in a panic over the loss of more than two hundred thousand dollars. Wood told McKean that the money was owed to his source of cocaine in Columbia, and that Russo's wife had been carrying it at the airport in Miami when Customs agents confiscated it.[8] Testimony from Bedami and Hernandez showed that both Wood and Lorenzo were heavily involved in the Bedami organization during that time.

The elements of proof for the § 843(b) facilitation count are (1) knowing or intentional (2) use of a telephone (3) to facilitate the commission of an offense.... Whatever underlying offense

---

7. Also, as proof of compelling prejudice, Russo points out that codefendant Salvatore Lorenzo was granted severance and was acquitted on the § 843(b) charge in a separate trial. He argues that this is proof that he would not have been convicted had he not been tried en masse. We note first that Lorenzo was granted severance only because of the illness of his attorney. In addition, the facts that Lorenzo was acquitted in a separate trial and that Russo might have had a better chance of being acquitted in a separate trial do not constitute compelling prejudice. *See Kabbaby*, 672 F.2d at 861–62.

8. Russo states in his reply brief that this testimony by McKean constituted inadmissible coconspirator hearsay. Russo has not referred us to an objection of any sort to this testimony or to coconspirator hearsay testimony generally. Our review of the record, the transcript, and this particular testimony does not reveal any sort of hearsay objection by Russo. Accordingly, we find that Russo failed to preserve this evidentiary issue for appeal.

In order to find plain error under Fed.R. Crim.P. 52(b), we must find that the admission of this testimony constituted a miscarriage of justice. *See United States v. Chaney*, 662 F.2d 1148, 1153 (5th Cir. Unit B 1981). We cannot find that this lofty standard has been met. Substantial independent evidence of a conspiracy between Wood and Russo existed to justify the admission of Wood's statements under Fed.R. Evid. 801(d)(2)(E). McKean's testimony that Wood held meetings and made payoffs at Russo's house, coupled with the transcripts of Russo's telephone conversations with Wood in which they tried to fabricate a story explaining the source of the confiscated money, was sufficient independent evidence of the conspiracy. *See id.* at 1153–54.

**1464**

is charged must be proved by a preponderance of the evidence, even though it is not separately charged.

*United States v. Rey*, 641 F.2d 222, 224 n. 6 (5th Cir. Unit A) *cert. denied*, 454 U.S. 861, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981). "A *prima facie* case need not include proof that the defendant committed the underlying offense, ... only that the accused *facilitated* its commission." *United States v. Ward*, 696 F.2d 1315, 1319 (11th Cir.) (citing *Rey*, 641 F.2d at 227 n. 10) (emphasis in original), *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983).

■ The government proved to the requisite degree of certainty that Wood and others distributed cocaine during the relevant period of time. The facilitation element requires the government to show "that the telephone call comes within the common meaning of facilitate—'to make easier' or less difficult, or to assist or aid." *Phillips*, 664 F.2d at 1032. Viewing the evidence in a light most favorable to the government, we find that a reasonable jury could have found Russo guilty of the § 843(b) violation charged beyond a reasonable doubt. The evidence shows that the money confiscated from Russo's wife was owed to Wood's cocaine source. The evidence further shows that Russo's wife was carrying the money for Russo. Russo used the telephone conversations to attempt to get his wife out of trouble, and to explain the source of the money in order to recover it from Customs. Russo thus knowingly facilitated the distribution of cocaine by Wood by attempting over the phone to retrieve Wood's drug money from Customs.

## V. CONCLUSION.

Having considered all arguments made by appellants, and having discussed those arguments of merit, we conclude that the convictions of Nick Russo, Joseph Pine, V.L. Underhill, Jeff Underhill, Rene Sanchez, James Lowery, Harry Almerico and Felipe Muratte should be, and they are, AFFIRMED.