**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 03-4458**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES ELMER GROSS, JR., a/k/a Grip, a/k/a Man,

Defendant - Appellant.

---

**No. 03-4459**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES D. WILKES, a/k/a Turkey,

Defendant - Appellant.

---

**No. 03-4543**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RONALD EDDIE,

Defendant - Appellant.

## No. 03-4641

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES EARL FEASTER,

Defendant - Appellant.

## No. 03-4673

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES ELMER GROSS, SR., a/k/a Stink,

Defendant - Appellant.

Appeals from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CR-02-201-JFM)

Argued: February 3, 2006          Decided: June 28, 2006

2

Before TRAXLER, GREGORY, and DUNCAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded in part by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Traxler joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Gary Allen Ticknor, Elkridge, Maryland; Robert Henry Waldman, Annapolis, Maryland, for Appellant. Christine Manuelian, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Neil I. Jacobs, Rockville, Maryland, for Appellant Ronald Eddie; Frank Policelli, Utica, New York, for Appellant James Earl Feaster; Francis Albert Pommett, III, NATHANSON & POMMETT, P.C., Baltimore, Maryland, for Appellant James Elmer Gross, Sr. Allen F. Loucks, United States Attorney, Robert R. Harding, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

DUNCAN, Circuit Judge:

James Gross, Sr., James Gross, Jr., James Wilkes, James Feaster and Ronald Eddie appeal their convictions and sentences for numerous offenses arising out of a racketeering enterprise and conspiracy operated in Baltimore, Maryland. For the reasons that follow, we affirm all of the appellants' convictions and affirm Ronald Eddie's sentence. We vacate the sentences of James Gross Sr., James Gross, Jr., and James Wilkes, and remand for resentencing consistent with United States v. Booker, 543 U.S. 220 (2005).

I.

At differing times, the wide-ranging conspiracy at issue involved one or more, but rarely all, of the appellants simultaneously. We therefore initially present only those facts descriptive of the operation generally. We provide additional facts as necessary to discuss the specific issues raised by individual defendants.

James Gross, Sr. ("Gross Sr.") and Louis Colvin ("Colvin") were incarcerated on federal drug charges from the early to late 1990s. While his father was in prison, James Gross, Jr. ("Gross Jr.") became involved in drug trafficking. When Gross Sr. and Colvin were released, they joined and eventually assumed the leadership of Gross Jr.'s drug trafficking operation. Testimony

4

would establish that the Gross-Colvin operation, and later, the operation led by Gross Sr., trafficked in large quantities of cocaine and heroin obtained from a variety of sources including contacts located in New York and Delaware. Evidence introduced at trial reflected that the enterprises made approximately $3,000 to $3,500 a day selling heroin, and $8,000 to $10,000 a day selling cocaine.

Using proceeds from the drug trafficking activities, Gross Sr. and Colvin opened a nightclub called Strawberry's 5000 in 1999. Although Strawberry's 5000 was the hub of their illicit activities, Gross Sr. and Colvin also opened and ran other front businesses, including another nightclub called Intellects.

Gross Sr. obtained an insurance policy for Strawberry's 5000 that provided $300,000 in coverage for the building and $100,000 in coverage for the business property that it contained. Because Gross Sr. and Colvin had prior felony convictions, however, they were unable to obtain a liquor license in their own names. They recruited James Feaster ("Feaster") to act as nominal owner of the club and obtain the liquor license in his name. In documentation to the Liquor Board, Feaster claimed that he was a 100% stockholder of and was making ongoing financial contributions to the nightclub. Gross Sr. and Colvin testified that they had obtained a food permit for the club in their own names for logistical reasons. Gross Sr. also testified that he worked for the club as a consultant. In

5

fact, Gross Sr. and Colvin owned Strawberry's 5000; Feaster was paid a salary and provided a sport utility vehicle for his participation in the enterprise.

Throughout 1999, Feaster engaged in a pattern of behavior reflecting inconsistent positions regarding his involvement with Strawberry's 5000. For example, he entered into a number of financial transactions, including the refinancing of his home and lease transactions for several new cars. In the documentation for these transactions Feaster stated that he was employed as a college campus security officer and worked a second job as a manager at Strawberry's 5000. He made no representations in these documents regarding an ownership interest in the club. However, during this same period, Feaster incorporated 5000 Entertainment LLC and applied for the club's liquor license. In February of 2000, the Liquor Board issued the liquor license for Strawberry's 5000 to Feaster and 5000 Entertainment LLC.

In March of 2000, Strawberry's 5000 was raided by the Drug Enforcement Agency ("DEA") in connection with an investigation into the drug trafficking activities of Gross Sr. and Colvin. Feaster represented to the agents that he was the owner and manager, although he later admitted to the DEA that Gross Sr. and Colvin were the true owners, and that he was paid a salary and had a car leased for him in exchange for having the liquor license in his name.

Later in March of 2000, Feaster informed the Liquor Board that he had purchased Strawberry's 5000, and made arrangements to have the insurance policy transferred into the name of 5000 Entertainment LLC. The Liquor Board convened a hearing, at which Colvin testified that Gross Sr. had told a club employee to testify that Feaster was the owner of the club. Colvin also testified to other conversations with Gross Sr. and Feaster about lying to the Liquor Board regarding the ownership of Strawberry's 5000. At the conclusion of the hearing, the Board suspended the club's liquor license for thirty days.

As Colvin's testimony at the Liquor Board hearing suggests, his relationship with the Grosses had begun to deteriorate. It deteriorated further in 2001, after Strawberry's 5000 burned to the ground. In the weeks prior to the fire, Gross Jr. talked to Colvin about setting fire to the building to collect the insurance proceeds. Colvin objected because of the club's financial success. Gross Jr. nevertheless approached Sean Chance ("Chance") and Ronald Eddie ("Eddie") about the proposed arson. Colvin and a club employee moved most of the television sets and much of the stereo equipment to Intellects, the other night club owned by Gross Sr. and Colvin. The alarm system was deactivated on January 20, 2001 using Gross Sr.'s alarm code, and was not reactivated prior to the fire.

7

On January 27, 2001, the day of the fire, Gross Jr., Chance and Eddie obtained gasoline and crafted lighting devices using tennis balls. They took the devices to Strawberry's 5000, where Chance acted as a lookout and Eddie and Gross Jr. set the fire. Gross Sr. later informed Colvin that Gross Jr. had followed through on the plan to burn Strawberry's 5000.

On the day of the fire, Feaster had gone to the club and observed that stereo equipment was missing. When he confronted Colvin about it, Colvin claimed that the equipment was actually rental property that had been returned. Feaster later admitted to a Baltimore County Detective that he knew this statement was false.[1] Nevertheless, two days after the fire, Feaster contacted the insurance company that held the policy on the club in order to report the fire, and filed a claim for the limits of the policy. When the insurance checks were received, Feaster was paid $30,000 of the proceeds.

By the summer of 2001, the relationship between Colvin and the Grosses had disintegrated irreparably. The Grosses had come to believe that Colvin was cutting them out of his business dealings. For his part, Colvin discovered that Gross Jr. had been stealing money from Intellects, which, by then, Colvin operated. This

---

[1]On June 26, 2001, agents of the Bureau of Alcohol, Tobacco and Firearms raided the Intellects nightclub and recovered pieces of stereo equipment that had been removed from Strawberry's 5000 prior to the fire.

8

discovery led to a fight between Gross Jr. and one of Colvin's employees. Colvin banned Gross Jr. from Intellects, which resulted in a lawsuit against Colvin by the Grosses.

A government witness, Martin Young ("Young") later testified that, during this period, he witnessed Gross Jr. point a gun at Colvin's head while the three of them were in an automobile together. Gross Jr. was in the back seat while Colvin was in front. Young saw Gross Jr. point the gun, but Colvin did not. Nevertheless, Colvin came to believe that the Grosses had put out a hit on him, and the three had several tense encounters. On one occasion, Gross Jr. and his confederates surrounded Colvin at Intellects and threatened him. On another occasion, James Wilkes ("Wilkes"), at Gross Jr.'s behest, attempted to lure Colvin away from his security guards.

Matters came to a head between Colvin and the Grosses in September of 2001, when Wilkes shot Colvin. The bullet broke Colvin's wrist and traveled through his upper arm. Wilkes was witnessed fleeing the scene of the shooting. Wilkes was also later identified by Colvin and other witnesses, who had also observed him at Strawberry's 5000 and Intellects.

At about the time of the final break with Colvin, Gross Jr. began to experience difficulty obtaining drugs from his regular sources and turned to a Nigerian supplier. To obtain the necessary funds for the purchase of drugs, Gross Jr. and Chance planned an

armed robbery at a Stop, Shop 'N Save store in Baltimore. On September 13, 2001, Chance and another associate recruited by Gross Jr. robbed the store of approximately $2,350. Gross Jr. remained in the getaway car during the robbery. Both Gross and Chance were armed with 9mm firearms.

## II.

Following trial, appellants were convicted of numerous charges related to their racketeering activities. James Gross Sr. was convicted of racketeering in violation of 18 U.S.C. § 1962(c); conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); conspiracy to distribute and possession with the intent to distribute narcotics in violation of 21 U.S.C. § 846; malicious destruction of a building and vehicle by means of fire in violation of 18 U.S.C. § 844(I); use of fire to commit a felony in violation of 18 U.S.C. § 844(h)(1); two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(1); and mail fraud in violation of 18 U.S.C. § 1341. Gross Sr. was sentenced to a total term of 600 months in prison.

James Gross Jr. was convicted of racketeering in violation of 18 U.S.C. § 1962(c); conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); conspiracy to distribute and possession with the intent to distribute narcotics in violation of 21 U.S.C. § 846; three counts of violent crimes in aid of racketeering in

violation of 18 U.S.C. § 1959(a)(3) & (5); two counts of malicious destruction of a building and vehicle by means of fire in violation of 18 U.S.C. § 844(I); use of fire to commit a felony in violation of 18 U.S.C. § 844(h)(1); two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(1); mail fraud in violation of 18 U.S.C. § 1341; and possession of heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Gross Jr. was sentenced to a total of 412 months in prison.

James Feaster was convicted of conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d) and mail fraud in violation of 18 U.S.C. § 1341. Feaster was sentenced to a total of 30 months in prison.

James Wilkes was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and committing a violent crime in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3). Wilkes was sentenced to a total of 300 months in prison.

Ronald Eddie was convicted of racketeering in violation of 18 U.S.C. § 1962(d); conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); conspiracy to distribute and possession with intent to distribute narcotics in violation of 21 U.S.C. § 846; and malicious destruction of a building and vehicle by means of fire in violation of 18 U.S.C. § 844(I). Eddie was sentenced to a total of 262 months in prison.

The appellants timely filed this appeal challenging various aspects of their convictions and sentences.

### III.

Appellants make numerous claims of error with respect to their convictions, which we discuss in turn.[2]

### A.

Appellants argue that the district court erred by failing to conduct an <u>in camera</u> review of certain discovery materials that were requested from, but not produced by, the government with respect to government witness Sean Chance. Appellants argue that the following list of documents should have been reviewed by the court to determine whether they were discoverable under the Jencks Act, 18 U.S.C. § 3500, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) or <u>Giglio v. U.S.</u>, 405 U.S. 150 (1972):

(1)  notes, summaries and other materials related to the government's interviews with witness Sean Chance;

(2)  un-redacted grand jury testimony from the Bureau of Alcohol, Tobacco and Firearms agent Brian Klas; and

---

[2]James Wilkes and James Gross, Sr., appearing pro se, filed supplemental briefs challenging other aspects of the proceedings below. Having carefully reviewed their arguments, we find no reversible error. In addition, we have reviewed Ronald Eddie's argument regarding the sufficiency of the allegations in the indictment and find no reversible error.

(3)  Agent Klas' investigative reports.

Appellants' sought this information in pursuit of ammunition with which to attack Chance's credibility on cross-examination.  After reviewing the record, we find no error in the district court's decision not to conduct an <u>in camera</u> review of the requested materials.

1.  Jencks Act Claims

The Jencks Act requires the government to produce statements made by a witness that relate to the subject matter of his or her direct examination.  18 U.S.C. § 3500(b).  Under the Jencks Act, a "statement" is defined as an oral or written statement "signed or otherwise adopted or approved" by the witness, a recording or transcription that is a "substantially verbatim recital of an oral statement made by [the] witness and recorded contemporaneously with the making of such statement," or testimony made before a grand jury.  18 U.S.C. § 3500(e)(1)-(3).  The Act does not cover an investigator's notes of an interview with a witness unless the witness reviews and approves such notes.  <u>United States v. Roseboro</u>, 87 F.3d 642, 645 (4th Cir. 1996).  We review the denial of a request for materials under the Jencks Act for clear error. <u>Id.</u>

Where the government contests disclosure of material, "the Jencks Act vests trial judges with the affirmative duty of administering the Act by deciding whether government documents

13

relating to witness testimony are to be safeguarded or produced."

Id. In order to justify an in camera review of contested material, the defendant must

> first make a sufficiently specific request and provide some indication that the witness gave a pretrial statement . . . generally related to the witness' direct testimony. The defendant's showing need not be great, but it must be more than a mere automatic demand for government witness' statements. An inadequate foundation may be grounds alone on which the court can properly deny further inquiry.

Id. (emphasis added).

The district court's decision not to conduct an in camera review of the unredacted grand jury transcripts of Agent Klas and Agent Klas' investigative reports in relation to Sean Chance's testimony was not error because the appellants failed to make a "sufficiently specific request" for such materials. Appellants have not identified any specific request in the record identifying the information sought and providing some indication that it related to Chance's direct testimony. A general request for "all materials covered by the Jencks Act" fails to lay a sufficient foundation to invoke the district court's duty under the Act; the initial responsibility to identify lies with the defendant, not with the court.

The dissent argues that the district court's decision not to conduct an in camera review of the unredacted grand jury transcripts in relation to Agent Klas' testimony was error. This is not the case, however, because appellants failed to make a

14

timely request therefor.[3]  The law in this circuit is that "[t]o invoke a court's duty under the [Jencks] Act, a defendant must, <u>after the direct testimony</u> of a government witness, first make a sufficiently specific request and provide some indication that the witness gave a pretrial statement to a government agent generally related to the witness' direct testimony."  <u>Roseboro</u>, 87 F.3d at 645 (emphasis added).  Indeed, the text of the Jencks Act limits its own operation, including the mandate for <u>in camera</u> review under subsection (c), to the period of time <u>after</u> a witness has testified on direct examination.  18 U.S.C. §§ 3500(a) ("no statement or report . . . which was made by a Government witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."), (c).  Although the government can voluntarily agree to disclose Jencks Act material prior to the time when the act would require it do so, the act itself contains no requirement and, in fact, provides no legal basis either to compel production or order <u>in camera</u> inspection of contested materials prior to a witness's direct examination.

Appellants made their only specific request for the redacted portions of the grand jury transcripts on January 16, 2003, several

---

[3]In addressing this issue, we give appellants the benefit of the doubt with respect to whether they have waived it.  Although one could construe appellants' brief to raise this issue, it is neither clearly presented nor fully argued therein.

15

weeks before Agent Klas' direct examination on February 6, 2003. J.A. 538-39. The district court denied this request on January 21, 2003. J.A. 555. There is nothing in the record to suggest that appellants renewed this request or made a new Jencks Act request for the unredacted transcripts <u>after</u> Agent Klas' testimony. Had appellants made a such request after Agent Klas testified and laid the requisite foundation for an <u>in camera</u> inspection at that time, we might reach a different conclusion today. However, the record before us does not demonstrate that appellants made a timely request that was sufficient to invoke the district court's duties under the Jencks Act.

Further, the district court's decision not to conduct an <u>in camera</u> review of notes, summaries and other materials related to the government's interviews with witness Sean Chance was not error because the appellants failed to identify any representations made by Chance that would constitute a "statement" for purposes of the Jencks Act. Appellants point to nothing in the record to indicate that Chance signed, adopted or approved any statements that he made to the government. Nor do appellants point to evidence that the government made any recording or transcription of a statement by Chance. Because the appellants failed to lay a sufficient foundation for the investigative materials related to Chance to invoke the district court's duty under the act, the district

16

court's decision not review the Chance materials <u>in camera</u> did not prejudice them.

    2.    <u>Brady</u> and <u>Giglio</u> Claims

In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87. "[E]vidence is 'material' under <u>Brady</u>, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." <u>Wood v. Bartholomew</u>, 516 U.S. 1, 5 (1995) (citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995)). In <u>Giglio</u>, the Supreme Court held that, in cases where the "reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" of that witness is grounds for reversal. <u>Giglio</u>, 405 U.S. at 154 (quoting <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)) (internal quotations omitted). However, reversal is warranted only if the non-disclosure or suppression "'could . . . in any reasonable likelihood have affected the judgment of the jury.'" <u>Id.</u> (quoting <u>Napue</u>, 360 U.S. at 271). The appellants have failed to establish either <u>Brady</u> or <u>Giglio</u> error because they have not identified any evidence related to their request for materials concerning Chance

17

that – if produced – would warrant reversal under either standard. Chance was, at best, a peripheral player in the Gross/Colvin Enterprise whose testimony will not bear the weight appellants attempt to assign it.

B.

Gross Jr. argues that the district court erred in denying his post-trial motion for judgment of acquittal on the charge of using fire to commit a felony in violation of 18 U.S.C. § 844(h)(1) because the government failed to indict him for or convict him of the predicate offense of mail fraud in violation of 18 U.S.C. § 1341. We review the denial of a motion for judgment of acquittal de novo. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005).

Under § 844(h)(1), an individual "who uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States . . . shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years." 18 U.S.C. § 844(h)(1). Gross Jr. argues that this statute does not create a stand-alone cause of action, but, rather, requires the government to indict and obtain a conviction for whatever predicate felony involved the use of fire or explosive. Gross Jr. contends that because he was neither indicted for nor convicted of mail fraud, the government failed to prove an

18

essential element of the § 844(h)(1) charge. We find Gross Jr.'s argument unpersuasive.

We have not confronted this issue before in the context of a § 844(h)(1) charge, but have addressed a similar argument in the context of a charge brought under 18 U.S.C. § 924(c)(1). See United States v. Crump, 120 F.3d 462, 466 (4th Cir. 1997). Under § 924(c)(1), "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm . . . shall, in addition to the punishment provided for such crime of violence or drug trafficking crime," be subject to additional penalties. 18 U.S.C. § 924(c)(1). We have recognized that "18 U.S.C. § 844(h)(1) is almost identical to § 924(c)(1), it differs only in the fact that the defendant must use fire or explosive with the underlying crime." United States v. Barnette, 211 F.3d 803, 813 (4th Cir. 2000).

In Crump, we held that a conviction for violation of § 924(c)(1) "does not depend on [the defendant] being convicted-- either previously or contemporaneously--of the predicate offense, as long as all of the elements of that offense are proved and found beyond a reasonable doubt." Crump, 120 F.3d at 466. Based on the similarities between § 844(h)(1) and § 924(c)(1), and our treatment of § 924(c)(1) in Crump, we conclude that the government did not need to indict Gross Jr. for or convict him of the predicate

19

offense in order to obtain a conviction for violation of §
844(h)(1). See United States v. Nguyen, 28 F.3d 477, 481 (5th Cir.
1994) (upholding § 844(h)(1) conviction based on strength of
evidence of predicate offense where defendant was contemporaneously
acquitted of predicate offense). The government did, however, need
to prove each element of the predicate offense to the jury beyond
a reasonable doubt in order to convict Gross Jr. under § 844(h)(1).
Although Gross Jr. did not challenge the sufficiency of the
evidence on this count, our independent review of the record
demonstrates that there was sufficient evidence to support the
jury's verdict in this regard. Accordingly, we find no error in
the district court's denial of Gross Jr.'s motion for judgment of
acquittal on count 10.

C.

Appellant Feaster argues that the district court erred in
denying his motion for severance based on the possible spillover
effect of the evidence admitted against his co-defendants. Feaster
argues that he was a minor player in the racketeering enterprise
who was not involved in the heinous acts of the co-defendants, and
that the evidence admitted against them prejudiced him.

We review a district court's denial of a motion for severance
for abuse of discretion. United States v. Ford, 88 F.3d 1350, 1361
(4th Cir. 1996). A "party moving for severance must establish that

prejudice would result from a joint trial." United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir. 1992).

We find Feaster's argument unpersuasive. "[D]efendants who have been charged in the same conspiracy indictment should ordinarily be tried together." Id. Because Feaster was involved in the same overall conspiracy as his co-defendants, it was proper for all of the co-conspirators to be tried together. The mere fact that evidence against one defendant may be stronger than other defendants does not warrant severance. Id. Each of the charges against Feaster arose out of the same racketeering enterprise as those of his co-defendants. While Feaster was not alleged to have engaged in some of the more egregious acts perpetrated by his co-defendants, that fact alone does not justify severing his trial. Further, Feaster is unable to meet his burden of showing that he was predjudiced by the joinder. The propriety of the district court's denial of the severance motion is confirmed by the fact that the jury convicted Feaster on one count of conspiracy to commit racketeering and one count of mail fraud, but acquitted him of racketeering and two counts of money laundering, thus demonstrating its ability to segregate the facts involving Feaster from those involving his co-defendants.

21

We next address the claims raised by the Appellants regarding the district court's denial of their various motions for judgment of acquittal based on insufficiency of the evidence. We review a district court's denial of a motion for judgment of acquittal de novo. Alerre, 430 F.3d at 693. A "jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it." United States v. Wilson, 198 F.3d 467, 470 (4th Cir. 1999). In determining whether there is substantial evidence in the record, "we view the evidence in the light most favorable to the government and inquire whether there is evidence that a 'reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). We now turn to an analysis of each claim.

1.   Count 2 against James Feaster (Conspiracy to Commit Racketeering)

Feaster argues that there was insufficient evidence to support his conviction for conspiracy to commit racketeering under 18 U.S.C. § 1962(d). Feaster contends that the government did not present sufficient evidence to demonstrate that he agreed to engage in a pattern of racketeering activity. We find no merit to this argument.

To prove a conspiracy charge under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the government must

22

establish that a defendant "'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.'" United States v. Starrett, 55 F.3d 1525, 1543 (11th Cir. 1995) (quoting United States v. Russo, 796 F.2d 1443, 1455 (11th Cir. 1986)). A defendant need only agree to participate in the overall enterprise; he need not evince an intent to participate in each individual predicate act. Id.

In considering the unique evidentiary nature of conspiracy charges, we have recognized that:

> [b]y its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement. Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. Indeed, a conspiracy may be proved wholly by circumstantial evidence.

Burgos, 94 F.3d at 857-58 (internal citations omitted). Here, the government presented sufficient circumstantial evidence, particularly when viewed in the light most favorable to it, from which the jury could infer Feaster's entrance into the conspiracy.

Specifically, the government put on evidence that (1) Feaster became involved in Strawberry's 5000 to facilitate circumventing the Liquor Board's rules on felons obtaining liquor licenses; (2) Feaster was directly involved in the corporate machinations surrounding Strawberry's 5000; (3) Feaster was paid a salary by the Gross-Colvin Organization and helped operate the nightclub, which

23

was a front for the organization's illicit activities; (4) Feaster was present both before and directly after the fire at the nightclub, and knew that Colvin was lying to him regarding the removal of stereo equipment from the club prior to the fire; (5) Feaster filed an insurance claim after the fire; and (6) Feaster received money from the insurance proceeds for the fire. This evidence is sufficient to support the jury's verdict against Feaster on Count 2.

   2.   Count 12 against James Feaster (Mail Fraud)

Feaster next argues that there was insufficient evidence to convict him of mail fraud because the government failed to prove that he had a specific intent to defraud the insurance company when he mailed the insurance claim form for the fire at Strawberry's 5000. This argument is similarly unavailing. In order to prove a claim for mail fraud, the government must establish a "specific intent to defraud, which 'may be inferred from the totality of the circumstances and need not be proven by direct evidence.'" United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001) (quoting United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993)). At trial, the government presented evidence that (1) Strawberry's 5000 was burned in order to recover insurance proceeds; (2) Feaster was aware that stereo equipment had been removed from the nightclub prior to the fire; (3) Feaster confronted Colvin about the missing equipment on the day of the fire and believed that Feaster lied to him about its

24

removal; (4) Feaster filed an insurance claim by mail two days after the fire; (5) Colvin later told Feaster that Gross Jr. deliberately set the fire; and (6) Feaster partly shared in the insurance proceeds.  This evidence is sufficient particularly when viewed in a light most favorable to the government for the jury to infer that Feaster had a specific intent to defraud the insurance company when he mailed the claim form for the fire.

> 3.    Count 17 against James Wilkes (Violent Crimes in Aid of Racketeering - the assault on Louis Colvin)

Although Wilkes concedes that there was sufficient evidence for the jury to conclude that he assaulted Colvin, he argues that the evidence was not sufficient to establish that he committed this assault in connection with the racketeering enterprise.  We are unpersuaded by this argument.

In order to establish that Wilkes committed a violent crime in aid of a racketeering enterprise, the government had to prove, inter alia, that Wilkes committed a violent crime "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a). Particularly when viewed in the light most favorable to the government, there was sufficient evidence presented at trial to meet this burden.

The government presented evidence of the deterioration in the relationship between Colvin and the Grosses.  The evidence reflected that, as a consequence, Gross Jr. took steps to harm

25

Colvin, and sought Wilkes' assistance in doing so. Wilkes was already involved with Gross Jr. in the drug trafficking activities of the enterprise. Sean Chance testified that Gross Jr. stored guns, drugs and drug paraphernalia in Wilkes' apartment. Chance further testified that the day before Wilkes was arrested for possession of a firearm, the two men rode around with Gross Jr. trying to find Colvin because Gross Jr. wanted to torture and kill him. The gun in Wilkes' possession on that day was subsequently recovered from his apartment along with two of Gross Jr.'s scales. On another occasion, Wilkes attempted to lure Colvin away from his bodyguards. Finally, on September 24, 2001, Wilkes shot Colvin. There is ample evidence from which the jury could infer that Wilkes committed that assault for the purpose of maintaining his position in the enterprise.

4.    Counts 1 and 2 against James Gross Jr. (Racketeering and Conspiracy to Commit Racketeering)

Gross Jr. argues that there was insufficient evidence to support his conviction for racketeering and conspiracy to commit racketeering. He contends that the government failed to demonstrate his participation in three of the predicate RICO acts underlying his convictions: the Stop, Shop and Save robbery (racketeering act 3); the assault on Peter Williams (racketeering act 13) and the assault on Louis Colvin (racketeering act 14). In order to prove a charge of racketeering under 18 U.S.C. § 1962(c) or conspiracy to commit racketeering under 18 U.S.C. § 1962(d), the

26

government must establish, inter alia, that the defendant either engaged in or conspired to engage in at least two racketeering acts. See 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" required under 18 U.S.C. § 1962(c) as requiring "at least two acts of racketeering activity"); United States v. Tillett, 763 F.2d 628, 632 (4th Cir. 1985) (requiring proof of conspiracy to engage in two predicate RICO acts for conviction under 18 U.S.C. § 1962(d)).

Gross Jr. was found guilty of ten predicate RICO acts by the jury. Even accepting his argument regarding the insufficiency of the evidence to support his conviction on the three predicate acts he challenges on appeal, Gross Jr. does not challenge the seven other predicate acts proved by the government. We therefore find Gross Jr.'s argument unpersuasive on this ground alone.

Gross Jr. next argues that there was insufficient evidence to support the enterprise element of the RICO charges against him.[4] In order to prove a RICO charge, the government must prove that the organization was a RICO enterprise with the basic elements of "continuity, unity, shared purpose and identifiable structure."

---

[4]Gross Jr. also argues that the pattern element of the RICO statute is unconstitutionally vague as applied to the facts of this case because it did not provide him sufficient notice that the activities alleged in the indictment constituted a pattern of racketeering activity that exposed him to a RICO prosecution. We have previously rejected such as-applied challenges, United States v. Bennett, 984 F.2d 597, 606-07 (4th Cir. 1993), and do so here on the facts of this case.

27

United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting United States v. Griffin, 660 F.2d 996, 1000 (4th Cir. 1981)). Gross Jr. argues that the government failed to provide sufficient evidence to establish these components. We find no merit to his arguments. The evidence establishes that there was continuity in the organization in that it was headed by Gross Sr. and Colvin -- and later by Gross Sr. alone -- with Gross Jr. and various other individuals as active members over a period of at least four years. There was unity in the organization in that its activities were coordinated and operated through the various businesses created by Gross Sr., Colvin and the other members. There was a shared purpose of making money by illicit means, including drug dealing and fraud. There was an identifiable structure in that the organization was headed by Gross Sr. and Colvin -- and later by Gross Sr. alone -- with Gross Jr. and various other individuals as the street level operatives. Based on these facts, we find that the government presented sufficient evidence to support the enterprise element of the racketeering charges against Gross Jr.

Although Gross Jr. also purports to challenge his conviction for conspiracy to commit racketeering based on the sufficiency of the evidence, he failed to lodge any specific argument against the conspiracy charge independent of his general arguments against his substantive racketeering conviction. Regardless, we find that there was sufficient evidence to support his conviction for

28

conspiracy to commit racketeering. "To establish a RICO conspiracy violation . . ., the government must prove that the defendant[] 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.'" Starrett, 55 F.3d at 1543 (quoting Russo, 796 F.2d at 1455). The government presented extensive evidence of Gross Jr.'s participation in the illicit activities of the Gross-Colvin Organization and, after the falling out with Colvin, the Gross Enterprise. This evidence was sufficient to support Gross Jr.'s RICO conspiracy conviction.

    5.    Count 17 against James Gross Jr. (violent crime in aid of racketeering, aiding and abetting - the assault on Louis Colvin)

Gross Jr. next argues that there was insufficient evidence to convict him of aiding and abetting a violent crime in aid of racketeering ("VICAR") for the assault on Louis Colvin because the government failed to prove that he took any action with the specific intent to facilitate the assault. This argument is unavailing.

Proof of specific intent to facilitate a crime is a necessary element of a charge of aiding and abetting. See Burgos, 94 F.3d at 895 (Michael, J. dissenting in part and concurring in part). There is sufficient evidence here particularly when viewed in the light most favorable to the government from which the jury could infer that Gross Jr. had the specific intent to facilitate the assault on

29

Colvin in aid of the racketeering enterprise. The government presented evidence that (1) Colvin was an integral member of his father's racketeering enterprise; (2) Colvin had a significant and contentious falling out with Gross Sr. and Gross Jr. over the racketeering enterprise; (3) Gross Jr. sought out Colvin several weeks before the assault in order to kidnap and torture him; (4) Gross Jr. pointed a gun at Colvin's head on another occasion; and (5) Gross Jr. threatened Colvin on another occasion. This evidence is sufficient to support Gross Jr.'s conviction for aiding and abetting a violent crime in aid of racketeering.

6.   Count 4 against James Gross Jr. (violent crimes in aid of racketeering - the assault on Peter Williams)

Gross Jr. argues that there was insufficient evidence to convict him of a violent crime in aid of racketeering for the assault on Peter Williams. In August 2000, a fight broke out in Strawberry's 5000 that involved Peter Williams ("Williams"), an individual unrelated to the Gross-Colvin Organization's racketeering activities, and Colvin. Gross Sr. became involved in the melee and was struck over the head with a metal stanchion by Williams. Gross Sr.'s injury required hospitalization. While at the hospital with his father, Gross Jr. talked with Colvin and Chance about exacting revenge against the man who had assaulted his father. Chance testified that Gross Jr. indicated that he wanted to handle revenge on Williams "[b]ecause it was personal. It was his father." J.A. 301.

In November 2000, Williams was shot while driving his car. A passenger in Williams' car testified to seeing a silver Lexus, the type of car driven by Gross Jr., following them just prior to the shooting. Chance testified that during the week prior to the shooting, he had driven around Baltimore with Gross Jr. and Michael Randolph ("Randolph"), another individual involved in the racketeering enterprise, looking for Williams to exact revenge for the assault on Gross Sr. Chance further testified that Gross Jr. and Randolph came to his house after the shooting and stated that they had gotten "the guy." Gross Jr. and Randolph then described to Chance how the shooting occurred.

Gross Jr. subsequently directed Chance and Randolph to destroy the silver Lexus he had been driving when the Williams shooting occurred. When Chance and Randolph complied, Gross Jr. called the police to report the fire and later filed an insurance claim for the Lexus.

In order to prove the VICAR claim for the assault on Williams, the government must show, inter alia, that Gross Jr. engaged in a violent act "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The government need not show that "maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive." United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992). Rather, this element

31

is satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Id. Gross Jr. argues that the government cannot satisfy this element because he undertook the assault on Peter Williams for personal reasons, rather than reasons related to the racketeering conspiracy. We find this argument unpersuasive.

Based on the facts surrounding the shooting of Williams, the government presented sufficient evidence, particularly when viewed in a light most favorable to it, to establish that Gross Jr.'s assault on Williams was motivated at least in part by a desire to maintain or increase his position within the racketeering enterprise. The shooting was in retaliation for an assault on one of the leaders of the enterprise that occurred at the hub of the its illicit activity. Further, it is significant that Gross Jr. enlisted members of the enterprise to assist him in locating and assaulting Williams, and then in covering their tracks by destroying evidence. The evidence reflects that one of Gross Jr.'s primary roles in the enterprise was to serve as an enforcer. His failure to avenge a physical assault on his father would assuredly have undermined his credibility in this regard. This evidence supports the jury's verdict because it establishes a sufficient connection between the racketeering enterprise and the assault to

32

support the inference that Gross Jr. undertook the assault on Williams at least in part to aid the racketeering enterprise.

E.

Gross Sr. argues that the district court erred by denying his motion to dismiss the indictment against him based on a plea agreement that he entered into with the United States and the State of Maryland in July 2000.

On February 8, 1999, Gross Sr. sold heroin to a confidential informant and was subsequently arrested. In addition to violating state drug laws, Gross Sr.'s sale of heroin also violated the terms of his federal supervised release for drug violations in the early 1990s. Following his arrest, Gross Sr. entered into a plea agreement with both state and federal officials. Under its terms, the government agreed not to prosecute Gross Sr. for any conduct other than the supervised release violations of which it was aware that occurred prior to the date of the agreement. J.A. 72 (Plea Agreement ¶ 11). In addition, Gross Sr. agreed that he would "not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case." J.A. 70 (Plea Agreement ¶ 1(e)). In January 2001, Gross Sr. was arrested for raping a twelve year old girl at Strawberry's 5000 and pleaded guilty. As a result, the government nullified the plea agreement and later charged Gross Sr. with the various

33

racketeering-related charges in this case. Gross Sr. sought to have all charges against him dismissed based on the plea agreement by arguing that, under it, the government agreed not to prosecute him for any conduct prior to the date of the agreement, and the rape constitutes such conduct. The district court denied his motion, and Gross Sr. now appeals that denial. We find Gross Sr.'s arguments unpersuasive.

Gross Sr. first argues that the state rape charge did not constitute a breach of the plea agreement because it was not material to the subject matter of the agreement. This argument lacks merit because, under the agreement, Gross Sr. agreed not to commit "any crime," not just those that were material to the subject matter of the agreement.

Gross Sr. next argues that Paragraphs 10 and 15 are ambiguous with respect to the government's remedies in the event he breached the plea agreement. We find no merit to this argument. Paragraph 10 of the agreement, in relevant part, provides that "if the terms of this agreement are not met by your client, he agrees to serve a term of imprisonment for two years for [his supervised release] violations." J.A. 71-72 (Plea Agreement ¶ 10). Paragraph 15 provides, in relevant part, that "if [Gross Sr.] should commit any crime . . . ., then the State or [U.S. Attorneys Office] will be free . . . . to charge him with other offenses, if any, that he has committed." J.A. 73 (Plea Agreement ¶ 15)(emphasis added). We

find no ambiguity or conflict between these two provisions because each sets out a separate consequence for a breach of the agreement by Gross Sr. Paragraph 10 specifies the consequence in relation to Gross Sr.'s supervised release violations (two years imprisonment), and Paragraph 15 specifies the general consequence for breach (complete release of the governments' obligations). Accordingly, we find no error in the district court's denial of Gross Sr.'s motion to dismiss.

F.

Wilkes argues that the district court erred by denying his motion to suppress a gun seized during a warrantless search of Yvonne Shorts' apartment where he resided at the time and statements that he made during the course of and directly after that seizure. Wilkes claims that the search violated the Fourth Amendment because the Baltimore City Police officers entered Shorts' apartment without a warrant prior to receiving consent to enter. Wilkes seeks to have all evidence -- both physical evidence and statements made by him during the search -- obtained through the search suppressed based on the illegality of the search. We find no merit to Wilkes' arguments.

In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and the legal

determination of whether such facts satisfy the Fourth Amendment <u>de novo</u>.  <u>United States v. Gwinn</u>, 219 F.3d 326, 332 (4th Cir. 2000).

Following his arrest, Sean Chance provided information to the Baltimore City Police that James Wilkes was in possession of a firearm at 921 North Carrollton Street in Baltimore.  On the basis of that information, Baltimore City Police conducted a warrantless search of that location on September 7, 2001.  At the time of the search, Wilkes resided at the apartment, but it was leased by Yvonne Shorts, Wilkes' girlfriend.  When the officers arrived at 921 North Carrollton Street, they found bags and boxes lying on the front stoop of the building and going up the stairs, suggestive of a tenant or tenants moving out.

The stairwell leading to Shorts' apartment terminated directly at the door to the apartment such that there was no vestibule, hallway or foyer between the end of the stairs and the beginning of the doorway.  The stairwell was so narrow that the officers had to proceed single file, avoiding the bags and boxes on the stairs as they ascended.  The stairs simply ended at the door to the apartment, with no landing.

When the officers reached the threshold of the apartment, the door to the apartment was wide open.  Because of the layout, even with the door standing open, the officers stood single-file on the narrow stairs and their view of the activities within the apartment was limited and they were necessarily vulnerable to aggression.

36

The officers knocked on the open door and identified themselves. Again, because of the way in which the entrance was configured, the officers had to cross the threshold of the apartment in order to knock on the door and identify themselves.

After the officers knocked on the door, Yvonne Shorts and James Wilkes appeared from another door in the apartment, and both acknowledged that it was Shorts' apartment. Officer James Knorlein then asked Shorts if he could speak with her in private. She consented and led Officer Knorlein to the kitchen, while several other officers remained with Wilkes in the living room. Shorts heard the officers ask Wilkes to take a seat on the couch.

Once in the kitchen with Officer Knorlein, Shorts stated that she had seen both guns and drugs in the apartment before. She also told Officer Knorlein that she saw Wilkes throw a handgun into a clothes hamper in the bedroom when they heard the officers approaching her apartment. Shorts was visibly upset and stated that she was scared of Wilkes. Shorts then suggested as a ruse that Officer Knorlein obtain her cigarettes from the bedroom, to provide him with a reason to enter the room and observe the gun without revealing her complicity to Wilkes.

At Shorts' suggestion, Officer Knorlein then entered the bedroom ostensibly to retrieve the cigarettes. While doing so, he observed a .45 caliber semi-automatic handgun sitting on top of the clothes hamper. Officer Knorlein re-entered the living room and

alerted the officers watching Wilkes that he had found a handgun. Wilkes was placed under arrest, handcuffed and told to sit back down on the couch.

Officer Knorlein then went back to the kitchen with Shorts and asked her whether she would sign a consent to search form. She agreed to do so and signed the consent form. The officers searched the residence and found ammunition and two scales that later tested positive for cocaine and heroin residue. At the conclusion of the search, Wilkes was transported to a police station for processing.

After the officers entered Shorts' apartment, they asked Wilkes whether his nickname was "Turkey." They asked Wilkes no other questions. However, Wilkes talked throughout the encounter and made a number of incriminating statements. The district court specifically found the officers' testimony about these events to be credible.

Wilkes argues that the officers' search of Shorts' apartment was unconstitutional because they crossed the threshold of the apartment without a warrant and, therefore, all of the fruits of that search should have been suppressed. We do not find this argument persuasive.

The Fourth Amendment precludes a warrantless entry or search of a home except where exigent circumstances are present. Payton v. New York, 445 U.S. 573, 590 (1980). "The existence of exigent circumstances must be determined as of the moment of the

warrantless entry of the officers onto the premises of appellee."
United States v. Reed, 935 F.2d 641, 643 (4th Cir. 1991). "Courts should consider '[t]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers.'" Id. (quoting United States v. Wysocki, 457 F.2d 1155, 1160 (5th Cir. 1972)). The circumstances here justified the officers' breach of the apartment's threshold in order to announce their presence.

When the officers approached Shorts' apartment, the door was wide open. Based on the physical layout of the approach to the threshold of and the actual entrance to the apartment, the officers had no choice but to cross the threshold in order to knock on the open door and announce their presence. The evidence indicates that the officers did not move significantly beyond the entryway until Shorts provided consent. Accordingly, we find that the exigencies created by the physical layout of the building in which Shorts' apartment was located were sufficient to justify the minimal breach of the threshold of her apartment. In any event, even if exigent circumstances did not exist and the officers' initial entry into Shorts' apartment was unlawful, we agree with the dissent that the consent that Shorts later provided purged the taint of any unlawful entry. We find no Fourth Amendment error in the officers' search of her apartment based on the valid consent she provided. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

39

Wilkes also argues that the district court erred by failing to suppress statements that he made during the time the officers were present in Shorts' apartment, both before and after he was placed under arrest. Wilkes essentially argues that any statements obtained from him were fruits of an illegal search of Shorts' apartment and should have been suppressed under the Fourth Amendment. Wilkes does not assert that the statements should have been suppressed under the Fifth Amendment. Because we find no Fourth Amendment violation in either the officers' entry into Shorts' apartment or subsequent search thereof, any statements that Wilkes voluntarily made while the officers were present in the apartment were not the fruits of an illegal search. We therefore find no error in the district court's denial of Wilkes' motion to suppress any such statements.

IV.

Having determined that appellants' convictions must be upheld, we turn to a consideration of their sentences. Appellants argue that their sentences should be vacated and their cases remanded for re-sentencing based on United States v. Booker, 543 U.S. 220 (2005). In Booker, the Supreme Court held that an application of the Sentencing Guidelines in which the district court enhanced the defendant's sentence based on facts it found during the sentencing proceeding violated the Sixth Amendment. Id. at 244. In the wake

40

of the decision we have come to recognize two types of <u>Booker</u> error: constitutional and statutory. <u>Rodriguez</u>, 433 F.3d 411, 414 (4th Cir. 2006). Constitutional <u>Booker</u> error arises where a district court enhances a defendant's sentence "beyond the maximum authorized by facts found by a jury beyond a reasonable doubt or admitted by the defendant." <u>Id.</u> Statutory <u>Booker</u> error arises where a district court treats the Guidelines as mandatory rather than advisory. <u>Id.</u> Here the appellants assert that their sentences are infected with constitutional <u>Booker</u> error, while the government asserts that only statutory <u>Booker</u> error exists. Therefore, we must consider whether the appellants' sentences must be vacated and remanded under either standard.

Because the appellants raise this issue for the first time on appeal, we review for plain error. Fed. R. Crim. P. 52(b); <u>United States v. Olano</u>, 507 U.S. 725, 731-32 (1993). "A defendant seeking to overturn a ruling under the plain-error test bears the burden of showing (1) that an error occurred, (2) that it was plain, and (3) that the error affected his substantial rights." <u>Rodriguez</u>, 433 F.3d at 415. In <u>Hughes</u>, we held that the imposition of a sentence that violated the Sixth Amendment under <u>Booker</u> constituted plain error. <u>See</u> <u>United States v. Hughes</u>, 401 F.3d 540, 555-56 (4th Cir. 2005) (holding that district court plainly erred "by imposing a sentence exceeding the maximum authorized by the jury findings alone" under <u>Booker</u>).

41

We now turn to an examination of each appellant's challenge to his sentence.

1.    James Gross Jr.

Gross Jr. argues that his sentence violates the Sixth Amendment under Booker because it was improperly increased based on numerous facts -- including the quantity of drugs involved in counts 3 and 13 -- that were neither found by the jury nor admitted by him.  Gross Jr. was convicted and sentenced on thirteen separate counts in the superseding indictment.  He was sentenced to 292 months on counts 1, 2, 3 & 13; 120 months on counts 4, 11 & 14; 240 months on counts 5, 6, 9 & 17 and 60 months on count 7.  The terms of imprisonment for these counts were to run concurrently.  In addition, Gross Jr. was sentenced to 120 months on count 10 to run consecutively to all other counts.  For purposes of our Booker analysis, we need look no further than Gross Jr.'s sentence on counts 1, 2, 3 and 13, which each produced the longest term of imprisonment, to determine the need to vacate and remand his sentence.

Gross Jr.'s sentences for counts 1 and 2, the racketeering and conspiracy to commit racketeering charges, were calculated by using "the offense level applicable to the underlying racketeering activity."  U.S.S.G. § 2E1.1(a)(2).  The presentence report, which the district court largely adopted, calculated the offense level for the underlying racketeering activity under § 3D1.2(d), which

42

states that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2(d). When sentencing under this grouping provision, the offense level for the grouped charges is determined by using the highest offense level of the grouped charges and then adding a grouping adjustment. U.S.S.G. §§ 3D1.3(b), 3D1.4.

For purposes of Gross Jr.'s sentence, the district court grouped counts 3, 4, 5, 6, 7, 9, 11, 13, 14 and 17. Counts 3 and 13, Gross Jr.'s drug violations, produced the highest base offense level of 38.[5] This offense level was achieved by attributing more than three but less than ten kilograms of heroin to Gross Jr., which yielded a starting offense level of 34 under § 2D1.1(c)(3), and then adjusting upward 4 levels based on specific offense characteristics under § 2D1.1(b)(1) and role in the offense under § 3B1.1(b).[6] A two level grouping adjustment under § 3D1.4 was then added to reach the final offense level of 40, which was then combined with a criminal history score of I to reach Gross Jr.'s sentence of 292 months for counts 1, 2, 3 and 13.

Gross Jr.'s sentence on these counts violates the Sixth Amendment under Booker because the quantity of drugs -- three to

---

[5]The next highest offense level of the grouped offenses was 33 for counts 4, 5 and 17, which dealt with the charges of violent crimes in aid of racketeering.

[6]Because we find Sixth Amendment error based on the quantity of drugs used to sentence Gross Jr., we need not address the propriety of the other adjustments applied by the district court.

ten kilograms of heroin -- that provided the basis for the starting offense level of 34 was not found by the jury beyond a reasonable doubt or admitted by Gross Jr.  The superseding indictment did not specify any drug quantity in count 13 and only alleged one kilogram or more of heroin and five kilograms or more of cocaine in count 3. When the jury returned its verdict, its findings mirrored the drug quantities identified in the indictment.  Therefore, the maximum quantity of drugs that Gross Jr. should have been sentenced for based on the jury's verdict was one kilogram of heroin and five kilograms of cocaine.  Such quantities yield a starting offense level of 32 for counts 3 and 13.  U.S.S.G. § 2D1.1(c)(4). Sentencing Gross Jr. on the basis of three to ten kilograms of heroin, rather than one or more, resulted in a two level increase in his base offense level, which increased his maximum sentence beyond that which was authorized by the facts found by the jury.

Gross Jr.'s sentence violates the Sixth Amendment under <u>Booker</u> because the quantity of drugs that provided the basis for his longest term of imprisonment was neither found by the jury nor admitted by Gross Jr.  Therefore, we must vacate Gross Jr.'s sentence and remand to the district court for resentencing. Because we find constitutional <u>Booker</u> error present, we need not address the issue of statutory <u>Booker</u> error.

2.    James Gross Sr.

For the same reasons outlined in relation to Gross Jr., we find that Gross Sr.'s sentence likewise must be vacated and remanded to the district court.  Gross Sr. was convicted and sentenced on eight separate counts in the superseding indictment. He was sentenced to 480 months on counts 1, 2 and 3; 240 months on count 9; 120 months on counts 11 and 14; and 60 months on count 12. Each of these sentences was to run concurrently.  Gross Sr. was also sentenced to 120 months on count 10 to run consecutively to the other counts.  For purposes of our Booker analysis, we need look no further than Gross Sr.'s sentence on counts 1, 2 and 3, which each produced the longest term of imprisonment, to determine the need to vacate and remand his sentence.

Gross Sr.'s sentence violates the Sixth Amendment under Booker for the same reasons detailed with respect to Gross Jr.. Gross Sr.'s sentences on counts 1 and 2, the racketeering and conspiracy to commit racketeering charges, were calculated by using "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(2).  The counts relating to Gross Sr.'s underlying racketeering activities were grouped under § 3D1.2(d) and count 3, the drug distribution charge, produced the highest base offense level of 40.[7]  This offense level was achieved by

---

[7]The next highest offense level of the grouped offenses was 28 for counts 9 and 12, which dealt with arson and mail fraud.

45

attributing three to ten kilograms of heroin to Gross Sr., which yielded a starting level of 34 under § 2D1.1(c)(3), and then adding adjusting upward 6 levels based on specific offense characteristics under § 2D1.1(b)(1) and role in the offense under § 3B1.1(b).[8] Gross Sr.'s offense level of 40 combined with a criminal history score of VI provided the basis for his 480 month sentence on counts 1, 2, and 3.

Gross Sr.'s sentence on these counts violates the Sixth Amendment because the quantity of drugs that provided the basis for his longest term of imprisonment was neither found by the jury nor admitted by Gross Sr. Therefore, we must vacate Gross Sr.'s sentence and remand to the district court for resentencing. Because we find constitutional Booker error present, we need not address the issue of statutory Booker error.

3. James Wilkes

Appellant Wilkes argues that his sentence should be vacated and remanded on constitutional grounds because it was increased based on facts that were neither admitted by him nor found by a jury beyond a reasonable doubt. We agree.

Wilkes was sentenced to 300 months on count 16 for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and to 240 months on count 17 for aiding and abetting a

---

[8]Because we find Sixth Amendment error based on the quantity of drugs used to sentence Gross Sr. we need not address the propriety of the other adjustments applied by the district court.

46

violent crime in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3).[9]  For the felon in possession charge, the district court sentenced Wilkes as an armed career criminal under 18 U.S.C. § 924(e)(1) and U.S.S.G. § 4B1.4 based on his present violation of 18 U.S.C. § 922(g)(1) and his prior convictions for a violent felony and multiple drug offenses.[10]  When calculating this sentence, the district court held that Wilkes qualified for an offense level of 34 under § 4B1.4(b)(3)(A) because he "used or possessed the firearm or ammunition in connection with either a crime of violence . . . or a controlled substance offense."[11] U.S.S.G. § 4B1.4(b)(3)(A).  The court made this finding based on facts that were neither admitted by Wilkes nor found by the jury

---

[9]These two charges involved different underlying facts. Wilkes violated § 922(g)(1) by possessing the firearm discovered at Yvonne Shorts' apartment.  He violated § 1959(a)(3) for participating in the assault on Louis Colvin that took place after the search of Shorts' apartment and involved a different firearm. The government did not charge Wilkes for any firearms violations for the gun he used to shoot Colvin.

[10]Wilkes was convicted of assault in 1987, drug distribution in 1989 and possession with intent to distribute cocaine in 1993. The facts necessary to categorize these offenses as either violent felonies or serious drug offenses for purposes of 18 U.S.C. § 924(e)(1) are inherent in the convictions.  See United States v. Thompson, 421 F.3d 278, 283-84 (4th Cir. 2005) (holding that facts inherent in prior convictions need not be submitted to a jury to pass constitutional muster under Booker).

[11]Without the armed career criminal enhancement, Wilkes' maximum base offense level was 24 under U.S.S.G. § 2K21.(a)(2) for his violation of 18 U.S.C. § 922(g)(1).

beyond a reasonable doubt.[12]  This finding increased Wilkes' base offense level as an armed career criminal from 33 to 34[13] and violated the Sixth Amendment because it resulted from improper judicial fact finding.

Accordingly, we vacate Wilkes' sentence and remand to the district court for re-sentencing.  Because we find constitutional Booker error present in Wilkes' sentence, we need not address the issue of statutory Booker error.

4.  Ronald Eddie

Appellant Eddie argues that he was improperly sentenced based on a finding that he was a career offender under U.S.S.G. § 4B1.1(a).  Eddie was sentenced to 262 months on counts 1, 2, and 3 and 240 months on count 9.  All of these sentences were to run concurrently.  The district court based the 262 month sentences for counts 1, 2 and 3 on a finding that Eddie was a career offender within the meaning of U.S.S.G. § 4B1.1.  Eddie argues that the district court violated the Sixth Amendment under Booker by

---

[12]Although Wilkes was also convicted of a violent crime involving the use of a firearm (the assault on Louis Colvin), that conviction has no bearing on the armed career criminal analysis because (1) Wilkes was never charged or convicted for possession of the firearm he used to assault Colvin; (2) that conviction involved different underlying facts than the § 922(g)(1) charge; and (3) violations of 18 U.S.C. § 1959(a) do not give rise to enhanced penalties under the Armed Career Criminal Act, see 18 U.S.C. § 924(e); U.S.S.G. § 4B1.4(b).

[13]If Wilkes had not qualified for an offense level of 34 under § 4B1.4(b)(3)(A), the greatest offense level he would have qualified for under § 4B1.4(b) was 33 under subsection (b)(3)(B).

48

sentencing him as a career offender.  We find no merit to this argument.

Under § 4B1.1(a), a defendant is a "career offender" if, inter alia, he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense."  U.S.S.G. § 4B1.1(a)(3).  Here, Eddie has three prior convictions that facially qualify as either crimes of violence or controlled substance offenses.  Specifically, Eddie was convicted of attempted murder in November 1996 for which he was sentenced to 10 years in prison with 5 years suspended and 3 years of probation; manufacturing and distributing a controlled substance in July 2001 for which he was sentenced to 2 years in prison; and manufacturing and distributing a controlled substance and possession of a controlled substance in September 2001 for which he was sentenced to 5 years in prison. The use of prior convictions and facts inherent therein are excepted from the constitutional limitations enunciated in <u>Booker</u>. <u>United States v. Thompson</u>, 421 F.3d 278, 281-82 (4th Cir. 2005).

Eddie, however, contends that the 2001 drug felonies could not be used for purposes of the § 4B1.1 enhancement because both involved conduct that formed the basis of the current racketeering charges against him and, therefore, did not constitute prior felony convictions that could be used for the career offender analysis. We find this argument unpersuasive.

49

In defining what constitutes a "prior felony conviction" for purposes of § 4B1.1, § 4B1.2(c) relies in part on the treatment of prior convictions under § 4A1.1 for purposes of the criminal history score computation. Under § 4B1.2(c), "prior felony convictions" can only be used in the career offender analysis if the prior sentences "are counted separately under the provisions of § 4A1.1(a), (b), or (c)." U.S.S.G. § 4B1.2(c). Section 4A1.1 computes a defendant's criminal history score based in part on his or her "prior sentences." Under Application Note 1 to § 4A1.2, "prior sentence" for purposes of § 4A1.1 "means a sentence imposed prior to sentencing on the instant offense, <u>other than a sentence for conduct that is part of the instant offense</u>." U.S.S.G. § 4A1.2, Application Note 1 (emphasis added). Therefore, as a general rule, where a defendant has prior convictions that were based on conduct that later forms the basis of a federal conviction, such prior convictions cannot be used for a career offender enhancement because of the relatedness of the underlying conduct. <u>See</u> <u>United States v. Garecht</u>, 183 F.3d 671, 676-78 (7th Cir. 1999).

RICO claims, however, present an exception to this general rule. Section 2E1.1 of the sentencing guidelines provides the offense level calculation for violations of 18 U.S.C. § 1962, which Eddie was convicted of violating. Application Note 4 of § 2E1.1 establishes that prior convictions that form "part of a 'pattern of

racketeering activity'" can be "treat[ed] as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense." U.S.S.G. § 2E1.1, Application Note 4. See United States v. Marrone, 48 F.3d 735, 738-39 (3d. Cir. 1995) (holding that RICO predicate acts can be used to compute criminal history score). Therefore, prior convictions are treated differently in RICO cases and can be used to increase a defendant's sentence even though they involve the same conduct underlying the RICO charge. Because RICO predicate acts can constitute "prior sentences" for purposes of § 4A1.1, we conclude that such predicate acts can also constitute "prior felony convictions" for purposes of the career offender analysis. See U.S.S.G. § 4B1.2(c).

Even if Eddie's 2001 felony drug convictions involved predicate conduct to the current RICO charges, the district court did not err in considering such convictions for purposes of determining whether Eddie was a career offender. Because the facts necessary to the determination that Eddie was a career offender inhere in his prior convictions and the sentencing guidelines do not limit the use of RICO predicate acts in the career offender analysis, we find no constitutional Booker error present in Eddie's sentence. We now turn to the issue of statutory Booker error.

Although the government concedes that statutory Booker error was present in this case, we are not bound by such concession. See Rodriquez, 433 F.3d at 414 n.6. "[A] court commits statutory error

51

if it treats the Guidelines as mandatory, rather than as advisory." Id. at 414.  Because this  was raised for the first time on appeal, we review for plain error.  Id. at 414-15.  Under this standard, the defendant bears the burden of establishing, inter alia, " whether 'after pondering all that happened without stripping the erroneous action from the whole, . . .  the judgment was . . . substantially swayed by the error.'"  United States v. White, 405 F.3d 208, 223 (4th Cir. 2005) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)) (omissions in original).

We conclude that Eddie has not satisfied his burden of demonstrating that the district court's sentence was "substantially swayed" by the mandatory nature of the guidelines.  Although Eddie was sentenced at the bottom of the applicable guideline range, "the record as a whole provides no nonspeculative basis for concluding that the treatment of the guidelines as mandatory 'affect[ed] the district court's selection of the sentence imposed.'"  Id. at 223 (quoting Williams v. United States, 503 U.S. 193, 203 (1992)).  At sentencing, the district court made no statements from which we can infer that it would have entered a different sentence but for the mandatory nature of the sentencing guidelines.  Accordingly, we find no statutory Booker error present in Eddie's sentence.

Because Eddie has not demonstrated either statutory or constitutional Booker error, we affirm his sentence.

52

V.

In light of the foregoing, we affirm all appellants' convictions and appellant Ronald Eddie's sentence. We vacate the sentences of James Gross, Sr., James Gross, Jr., and James Wilkes, and remand those cases to the district court for re-sentencing.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART, AND</u>
<u>REMANDED IN PART</u>

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority's resolution of most of the issues presented in this appeal, I must depart from its analysis in two respects.  First, I would remand this case to the district court under the Jencks Act for <u>in camera</u> consideration of Brian Klas's unredacted grand jury testimony.  Second, with respect to the district court's denial of James Wilkes's motion to suppress, I cannot agree with the majority that exigent circumstances justified the officers' warrantless entry of Yvonne Shorts's apartment.  However, because I believe that Shorts's subsequent actions "purged the taint" of the initial violation, I agree that the district court committed no error in denying the motion to suppress.

I.

The Jencks Act, 18 U.S.C. § 3500, requires the government to disclose "any statement" made by one of its witnesses that "relates to the subject matter" of that witness's testimony.  <u>Id.</u> § 3500(b). Under the Jencks Act, a "statement" is defined as: (1) "a written statement made by said witness and signed or otherwise adopted or approved by him;" (2) a recording or transcription that is "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement;" and (3) "a statement, however taken or recorded, or a

54

transcription thereof, if any, made by said witness to a grand jury." Id. § 3500(e). To lay a proper foundation for the required disclosure of Jencks Act materials, a defendant must "make a sufficiently specific request and provide some indication that the witness gave a pretrial statement . . . generally related to the witness' direct testimony." United States v. Roseboro, 87 F.3d 642, 645 (4th Cir. 1996).

I agree with the majority that the appellants failed to lay the requisite foundation for the prior statements of government witness Sean Chance, in that the appellants could not show that any of the requested materials contained Chance's "statements," as defined by the Jencks Act. Chance, however, was not the only government witness for whom the appellants sought Jencks Act discovery; they also requested the prior statements of witness Brian Klas, including his unredacted grand jury testimony. I believe that, with respect to witness Klas, it was improper for the district court to deny discovery without in camera review of Klas's unredacted grand jury testimony because it contained Klas's statements related to Klas's trial testimony.

Unlike their request for the Chance-related materials, the appellants laid the requisite foundation for their request of Klas's grand jury testimony. In both a written motion and in arguments to the district court at trial, the appellants specifically identified Klas's unredacted grand jury testimony as

55

one of the objects of their discovery request. See J.A. 538-39 (noting the dates of Klas's grand jury testimony and the missing pages in the transcript); J.A. 552-55 (discussing the requested discovery materials as they related to Klas's trial testimony). Moreover, grand jury testimony is, by definition, a "statement" under the Jencks Act. 18 U.S.C. § 3500(e)(3). Finally, the government itself acknowledged that some portions of Klas's grand jury testimony related to the subject of his trial testimony. See, e.g., J.A. 555 (government counsel stating that "[Agent Klas is] being called with respect to the John Brooks witness tampering issue, which they have all the grand jury testimony on").[1]

With this foundation before the district court, the government's sole argument against further disclosure or in camera review by the district court was that the undisclosed portions did not relate to the subject matter of Klas's testimony. The district court accepted this representation and refused to take further action. J.A. 555. However, the Jencks Act does not permit district courts to take the government at its word. To the contrary, the Jencks Act requires the district court to examine the disputed materials in precisely this circumstance:

---

[1] The government disclosed these portions of Klas's grand jury testimony as "Jencks/Giglio materials" prior to trial. J.A. 179-80. This was in accord with the discovery agreement the government entered into to provide all Jencks materials no later than two weeks prior to trial.

> If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court <u>shall</u> order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness.

18 U.S.C. § 3500(c) (emphasis added). Thus, it was the duty of the district court--not the government--to determine which portions of Klas's pretrial statement were to be redacted and which portions were to be disclosed. <u>See</u> <u>United States v. Alvarez</u>, 86 F.3d 901, 906-07 (9th Cir. 1996) ("Under the Jencks Act, the government did <u>not</u> have a right unilaterally to redact the reports. . . . [I]f the government believes a portion of a witness statement is irrelevant, the <u>entire statement</u> must be delivered to the court <u>in camera</u> for <u>the court</u> to decide whether a portion of the statement should be redacted."). Simply put, the district court did not comply with the plain language of the Jencks Act. <u>See</u> <u>United States v. Lewis</u>, 35 F.3d 148, 151-52 (4th Cir. 1994) (holding that the district court was required to conduct <u>in camera</u> review of a government witness's report, where the government asserted that the redacted portions of that report did not relate to the subject matter of the witness's expected testimony).[2]

---

[2]In rejecting this challenge, the majority holds that the appellants' request for the Klas materials was not timely because it was not renewed after Klas's direct testimony. Here, however, the government agreed to disclose Jencks Act materials prior to trial, and neither the government nor the district court expressed concern with the timing of the appellants' request.

Because the district court failed to fulfill its obligation of in camera review of Klas's grand jury testimony, remand is necessary to allow this examination to occur.  See United States v. Truong Dinh Hung, 629 F.2d 908, 920-21 (4th Cir. 1980) (remanding to the district court to examine whether undisclosed documents contained Jencks Act statements and, if so, whether nondisclosure was harmless error).  Therefore, I respectfully dissent from Part III.A.1 of the majority opinion, as I would remand this case to the district court to examine Klas's grand jury testimony.

## II.

I must also part ways with the majority's analysis of the denial of Wilkes's motion to suppress.  Unlike the majority, I would hold that the officers violated Wilkes's Fourth Amendment rights when they entered the apartment at which he was staying without a warrant.  Because I believe that Shorts's subsequent consent and other actions purged the taint of this initial

---

Presented with a similar situation in Lewis, we found that the duty of in camera review had been invoked prior to the witness's testimony.  See Lewis, 35 F.3d at 151 (where the government agreed to disclose Jencks Act materials prior to trial, holding that in camera review was required once the government objected to the complete disclosure of a report on the basis that it did not relate to the subject matter of the witness's expected testimony).  Although the district court could not have fully resolved the issue until after Klas's testimony, see id., as in Lewis, I believe that the appellants' request was sufficient to invoke in camera review.

violation, however, I ultimately agree that the denial of the motion to suppress was proper.

A.

"Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done . . . so that an objective mind might weigh the need to invade [the citizen's] privacy in order to enforce the law." McDonald v. United States, 335 U.S. 451, 455 (1948) (emphasis added). See also Groh v. Ramirez, 540 U.S. 551, 560 (2004) (quoting same). As particularly relevant here, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313 (1972). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). Where agents of the government nevertheless cross that line, the government bears the burden to demonstrate exigent circumstances that overcome their presumptively unreasonable entry. Welsh v. Wisconsin, 466 U.S. 740, 750 (1984).

Here, the majority concludes that the government has overcome the presumption of unreasonableness because, "the exigencies created by the physical layout of the building in which Shorts'

59

apartment was located were sufficient to justify the minimal breach of the threshold of her apartment." Op. at 39. I cannot agree. The bare fact of the physical layout of a building, without more, cannot constitute the sort of "grave emergency," which excuses a government agent's constitutional obligation to secure a warrant before entering a home. Rather, the sine qua non of the exigent circumstances exception is that some urgency or impending danger justifies immediate action without resort to a warrant. See Georgia v. Randolph, 126 S. Ct. 1515, 1524 n.6 (2006) (recounting situations where exigent circumstances would justify immediate, warrantless action by police). Accordingly, the Supreme Court has recognized that there would be exigent circumstances where: officers need to act immediately to preserve evidence, id.; officers are in hot pursuit of a suspect, Warden v. Hayden, 387 U.S. 294, 298-99 (1967); delay to obtain a warrant would endanger the safety of the officers or others, id.; a building is on fire, Michigan v. Tyler, 436 U.S. 499, 509 (1978); or a suspect is fleeing or likely to take flight, Johnson v. United States, 333 U.S. 10, 15 (1948).

Here, such exigencies did not exist. The government has failed to show any reason why it was immediately necessary for the officers to enter Shorts's apartment without a warrant. See McDonald, 335 U.S. at 456 (the government must show that the asserted exigencies made warrantless entry "imperative"). The

officers expressed no concern that the gun might be moved or destroyed, that delaying the investigation would threaten the safety of anyone inside or outside the building, that Wilkes might flee, or even that Wilkes was aware of the officers' presence. Accordingly, I cannot join the majority's finding that exigent circumstances justified the entry of Shorts's apartment.

## B.

Although I conclude that the officers' intrusion violated the Fourth Amendment, I nevertheless agree with the majority that the district court was correct to deny Wilkes's motion to suppress. Unlawful police action does not automatically render inadmissible all subsequently discovered evidence. Rather, exclusion depends upon "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (internal quotation marks omitted). In other words, we must examine whether the evidence was acquired sufficiently independent of the Fourth Amendment violation that it should not be considered the "fruit of the poisonous tree." See id.

The question of whether evidence is the tainted fruit of a Fourth Amendment violation is a fact-specific one. United States

v. Najjar, 300 F.3d 466, 477 (4th Cir. 2002).  To answer this question, we must consider several factors, including: "1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct."  Id.  See also Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

In United States v. Seidman, 156 F.3d 542 (1998), we examined these factors in a factually similar situation.  In that case, the government agent (an informant who was wearing a wire) entered the Seidman's home through an unlocked door without a warrant or consent.  Id. at 547-48.  Upon seeing the informant, Seidman did not object to his presence and soon motioned him into the kitchen.  Id. at 549.  About one minute after his entry, the informant began questioning Seidman about his illegal conduct.  Id.  The two then engaged in a forty-five minute conversation in which Seidman made incriminating statements.  Id.

In conducting the tainted fruit analysis, the Seidman court acknowledged that the time between the illegal entry and the acquisition of the evidence was quite short--beginning only about one minute after the unlawful entry.  Id.  On the second factor, however, the court found that Seidman's consent to Schoop's continued presence and his willingness to engage in conversation constituted intervening acts of free will that attenuated the connection between the illegal entry and the evidence.  Id. at 549

62

& n.10.  With respect to the third factor, the court found that the taint to be purged was a slight, technical violation that lacked the degree of coercion present in cases where the evidence had to be suppressed.  Id. at 549, 550.  In weighing the factors, the court therefore determined that the incriminating statements did not result from "exploitation of the unlawful entry."  Id. at 550.

The factors lead to a similar conclusion here.  First, although the time between the unlawful entry and the acquisition of the evidence is short, that factor alone is not dispositive.  See id. at 549.  Second, as in Seidman, Shorts's intervening actions almost immediately attenuated the taint arising from the intrusion.  Shorts's voluntary consent to the officers' entry further into her apartment and her discussion with Officer Knorlein in the kitchen confirms that her consent and cooperation were independent acts of free will, not the result of any coercive effect from the officers' two-foot breach of the threshold of her home.  Specifically, she confided in Officer Knorlein that she was afraid of Wilkes, divulged that Wilkes had thrown his handgun in the bedroom clothes hamper, and concocted a ruse about getting her cigarettes so that Officer Knorlein would have the opportunity to observe the gun.  Third, as in Seidman, examining the purpose and flagrancy of the misconduct reveals that the taint to be purged here is slight.  The officers entered the open door and stepped only a foot or two

beyond the threshold before Shorts consented to their further entry.

Accordingly, I believe the evidence here was acquired "sufficiently independent of the unlawful invasion to purge any taint arising from the initial entry." Id. at 547. That it was Shorts, and not Wilkes, who provided the consent does not affect this conclusion.[3] I therefore conclude that the motion to suppress was correctly denied and concur only in the judgment of Part III.F of the majority opinion.

### III.

For the foregoing reasons, I respectfully dissent from Part III.A.1 of the majority opinion to the extent that I would remand for the district court to examine Agent Klas's grand jury testimony pursuant to the Jencks Act. In addition, I concur in the judgment only as to Part III.F. I join the majority opinion in all other respects.

---

[3]Notably, there is no evidence that Wilkes objected to the further entry or search of Shorts's apartment. Cf. Randolph, 126 S. Ct. at 1526 ("[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").